IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, *et al.*,

        Plaintiffs,

v.

REPUBLIC OF SUDAN,

        Defendant.

CIVIL ACTION NO. 2:04cv428

## PLAINTIFFS' MOTION TO REOPEN CASE AND ENTER JUDGMENT

NOW COME Plaintiffs, by counsel, pursuant to the newly enacted *Justice for Victims of State-Sponsored Terrorism Act* (S. 1944) (enacted January 29, 2008), and respectfully request this Court to reopen this case, to reinstate claims that were dismissed, and to enter awards of damages that were previously held to be precluded, all as provided in the recent legislation. In support thereof, Plaintiffs submit the accompanying memorandum.

        Respectfully submitted,

        OLIVIA RUX, *et al.*

        By _Mary Jane Hall_
             Of Counsel

Mary Jane Hall (VSB No. 26509)
KAUFMAN & CANOLES, P. C.
150 West Main Street
Suite 2100 (23510)
Post Office box 3037
Norfolk, Virginia 23514
(757) 624-3130
Fax (757) 624-3169

Andrew C. Hall (Florida State Bar No. 111480)
1428 Brickell Avenue, Penthouse
Miami, Florida 33131
(305) 374-5030
Fax (305) 374-5033

James Cooper-Hill (Texas State Bar No. 04789300)
320 Olympic
Rockport, Texas 78382
(361) 729-3923
Fax (361) 727-0447

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing Plaintiffs' Motion to

Reopen Case and Enter Judgment has been served via U.S. Mail on this 29th day of January

2008, to Gregory N. Stillman, Hunton & Williams LLP, 500 East Main Street, Suite 1000,

Norfolk, Virginia 23510.

_____
Counsel for Appellants

::ODMA\PCDOCS\DOCSNFK\1324266\1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, *et al.*,

                    Plaintiffs,

v.                                              CIVIL ACTION NO. 2:04cv428

REPUBLIC OF SUDAN,

                    Defendant.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO REOPEN CASE AND ENTER JUDGMENT

This memorandum is submitted by Plaintiffs in support of their motion to reopen this case and enter judgment in favor of those Plaintiffs whose claims were dismissed, pursuant to the *Justice for Victims of State Sponsored Terrorism Act.*

### 1.    Background

Among the claims that were asserted in the instant action were the claims for intentional infliction of emotional distress by fifty-nine relatives of the servicemen and servicewomen who tragically perished as a result of the bombing of the U.S.S. COLE in Yemen on October 12, 2000. This Court dismissed those claims, finding that the Death on the High Seas Act, 46 U.S.C. app. § 762 was the exclusive remedy in this case and provided no remedy for these claimants.

This Court held in its July 25, 2007 Order that:

> [u]pon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, Sudan was held liable for its provision of material support and resources to Al Qaeda, which enabled the terrorist group to bring about the attack on the U.S.S. Cole. This Court awarded damages pursuant to the Death on the High Seas Act ("DOHSA") and found that DOHSA provided the exclusive remedy for wrongful deaths. The Court denied the remaining

claims of the 59 individual plaintiffs for damages for loss of consortium, loss of solatium, loss of society, mental anguish and emotional distress, because each of these claims is non-pecuniary in nature and consequently cannot be recovered under DOHSA.

The Order is attached hereto as **Exhibit "A."** The fifty-nine Plaintiffs adversely affected by that part of the Final Judgment have appealed to the United States Court of Appeals for the Fourth Circuit.[1]

The Court of Appeals has extended the briefing period for this appeal to February 19, 2008 because Congress had passed legislation titled *Justice for Victims of State Sponsored Terrorism Act* (S.1944) ("The Act") and the bill was awaiting action by the President of the United States. On January 28, 2008, the President signed this bill into law. The Act creates a private cause of action for wrongful death and solatium, including pain and suffering, for victims of terrorism that is independent of DOHSA that is the exact aspect of the law that was missing at the time of Court's ruling. Further, The Act expressly applied retroactively. The Act is attached hereto as **Exhibit "B."** Accordingly, the proper cause of action for the damages alleged in the instant case is through a private cause of action for wrongful death and solatium as described in detail below.

2.    <u>**Argument**</u>

The Act at §1605A(c), titled "Private Cause of Action," provides:

A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(a)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to --

---

[1]  Plaintiffs have filed a Motion for Summary Reversal with the Fourth Circuit Court of Appeals contemporaneously with the instant motion. The Motion for Summary Reversal is based upon the newly enacted legislation which provides the Plaintiffs with a remedy, independent of DOHSA, for damages resulting from terrorism and provides the Plaintiffs with the capability to obtain damages that were excluded under DOHSA.

(1) a national of the United States,

(2) a member of the Armed Forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3) [which includes a member of the armed forces], for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

The Act provides a statutory remedy for damages as a result of state-sponsored terrorism. The Act also provides that any action brought under § 1605(a)(7) allows this cause of action to be considered by the Court retroactively.

Section 1605A(c)(2)(A)(iii) provides the authority to reopen. As to any case that was "adversely affected on the grounds that [section 1605(A)(7)] fail[s] to create a cause of action against the state, … that action, and any judgment in the action shall, on motion made by plaintiffs to the United States District Court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under § 1605A(c) of Title 28, United States Code." § 1605A(c)(2)(A)(iii).

Furthermore, The Act creates a specific exception to DOHSA's otherwise general maritime application. When Congress enacts legislation, it is "generally presume[d] that Congress is knowledgeable about existing law pertinent to the legislation it enacts." Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 108 S.Ct. 1704 (U.S. 1988). Thus, Congress must be

3

presumed to have been aware that victims of terrorism on the high seas have no opportunity to recover pain and suffering. "A special law supersedes a more general one, regardless of the priority of enactment." Strackbein v. Dept. of Air Force, 2007 WL 858638 *6 (E.D. Wisc. 2007) citing Morton v. Mancari, 417 U.S. 535, 550-51 (1973); Preiser v. Rodriguez, 411 U.S. 475, 489-90 (1973); Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961); Central Commercial Co. v. C.I.R., 337 F.2d 387, 389 (7th Cir.1964) (stating that "it is a cardinal principle of statutory construction that the more specific controls over the more general"). See also U.S. v. Hinck, 2007-47 I.R.B. 1032, 127 S.Ct. 2011 (U.S. 2007) ("a precisely drawn, detailed statute pre-empts more general remedies" and "when Congress enacts a specific remedy when none was previously recognized, or when previous remedies were 'problematic,' the remedy provided is generally regarded as exclusive").

Congress' passed this Act with knowledge of the Court's reliance on DOHSA to the instant terrorism case. The Act's fact-specific application to terrorism cases, clearly indicates the intention of Congress to provide a specific remedy and an independent cause of action for terrorism cases, which is not controlled or limited by the general provisions of DOHSA. Courts no longer have to search for the proper cause of action in terrorism cases. Congress has supplied it.

Therefore, the fifty-nine Plaintiffs, all family members of the 17 sailors who died on the U.S.S. COLE, request this Court to reopen this matter, review the record, and enter a judgment in their favor for substantial damages under the *Justice for Victims of State Sponsored Terrorism Act* (S.1944), to include damages consistent with those allowed by The Act, which are initially precluded under DOHSA. Testimony generated at trial or by deposition prior to the trial is

4

sufficient for the Court to enter a revised judgment without the need for further testimony or other evidence.

WHEREFORE, Plaintiffs respectfully request that the Court grant their motion and award such other and further relief the Court deems appropriate.

Respectfully submitted,

OLIVIA RUX, *et al.*

By _Mary Jane Hall_
      Of Counsel

Mary Jane Hall (VSB No. 26509)
KAUFMAN & CANOLES, P. C.
150 West Main Street
Suite 2100 (23510)
Post Office box 3037
Norfolk, Virginia  23514
(757) 624-3130
Fax (757) 624-3169

Andrew C. Hall (Florida State Bar No. 111480)
1428 Brickell Avenue, Penthouse
Miami, Florida  33131
(305) 374-5030
Fax (305) 374-5033

James Cooper-Hill (Texas State Bar No. 04789300)
320 Olympic
Rockport, Texas  78382
(361) 729-3923
Fax (361) 727-0447

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing Memorandum in Support of Plaintiff's Motion to Reopen Case and Enter Judgment has been served via U.S. Mail on this 29th day of January 2008, to Gregory N. Stillman, Hunton & Williams LLP, 500 East Main Street, Suite 1000, Norfolk, Virginia 23510.

_____
Counsel for Appellants

::ODMA\PCDOCS\DOCSNFK\1324268\1

6

8331

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



OLIVIA RUX, et al.,

      Plaintiffs,

      v.

THE REPUBLIC OF SUDAN,

      Defendant.

Civil Action No. 2:04cv428

## ORDER

This matter is before the Court on Plaintiffs Olivia Rux *et. al*'s ("Plaintiffs'") motion to

amend this Court's Opinion & Order ("Order") of July 25, 2007, to enter judgment in the name

of Plaintiffs' personal representative under the Death on the High Seas Act, 46 U.S.C. app. § 761

*et seq.*, and to award prejudgment interest [Doc. No. 86].

      Plaintiffs' Motion is GRANTED. It is hereby ORDERED, pursuant to Federal Rule of

Civil Procedure 60(a), that the Order of July 25, 2007, which awarded judgments for stated

individuals, is hereby AMENDED such that the portion of the Order that provides judgments for

each individual for stated amounts by each individuals' name is vacated and in place thereof it is

substituted as follows:

      It is hereby ORDERED that judgment is entered for the personal representative of each

of the below-listed decedents in the following manner for the exclusive benefit of each of the

listed individuals as set forth below:

      1. Timothy Sceviour, as personal representative of Kenneth Eugene Clodfelter, in the

sum of $498,462 plus interest at eight (8) percent per annum from October 12, 2000, to July 25,

1





2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007, until paid in full, for the exclusive benefit of Jennifer Clodfelter (spouse) in the sum of $296,631 plus interest as above set forth, and Noah Clodfelter (son) in the sum of $201,831 plus interest as above set forth;

2. Timothy Sceviour, as personal representative of Richard Costelow, in the sum of $998,336 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007 until paid in full, for the exclusive benefit of Sharla Costelow (wife) in the sum of $549,658 plus interest as above set forth, and Ethan Costelow (son) in the sum of $235,309 plus interest as above set forth, and Brady Costelow (son) in the sum of $213,369 plus interest as above set forth;

3. Timothy Sceviour, as personal representative of Lakeina Monique Francis, in the sum of $209,296 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Ronald Wallace Francis (father) in the sum of $104,648 plus interest as above set forth, and Sandra Annette Franois (mother) in the sum of $104,648 plus interest as above set forth;

4. Timothy Sceviour, personal representative of Timothy Lee Gauna, in the sum of $269,898 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Sarah Gauna Esquival (mother) in the sum of $269,898 plus interest as above set forth;

5. Timothy Sceviour, personal representative of Cherone Louis Gunn, in the sum of $272,620 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Louge Gunn (father) in the sum of $136,310 plus interest as above set forth, and Mona Gunn (mother) in the sum of $136,310 plus interest as above set forth;

6. Timothy Sceviour, personal representative of James Rodrick McDaniels, in the sum of $541,750 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of James Rodrick McDaniels, Jr. (son) in the sum of $329,162 plus interest as above set forth, and Diane McDaniels (mother) in the sum of $212,588 plus interest as above set forth;

7. Timothy Sceviour, personal representative of Marc Ian Nieto, in the sum of $362,411 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jesse Leroy Nieto (father) in the sum of $362,411 plus interest as above set forth;

8. Timothy Sceviour, personal representative of Ronald Scott Owens, in the sum of $460,387 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jamie Owens (wife) in the sum of $271,210 plus interest as above set forth, and Isabella Marie Owens (daughter) in the sum of $189,177 plus interest as above set forth;

9. Timothy Sceviour, personal representative of Lakiba Nicole Palmer, in the sum of $529,376 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

3

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Capri Kumar (daughter) in the sum of $267,556 plus interest as above set forth, and Teresa Smith (mother) in the sum of $261,820 plus interest as above set forth;

10. Timothy Sceviour, personal representative of Joshua Langdon Parlett, in the sum of $234,836 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Leroy Parlett (father) in the sum of $117,418 plus interest as above set forth, and Etta Parlett (mother) in the sum of $117,418 plus interest as above set forth;

11. Timothy Sceviour, personal representative of Patrick Howard Roy, in the sum of $234,835 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Kate Brown (mother) in the sum of $234,835 plus interest as above set forth;

12. Timothy Sceviour, personal representative of Kevin Shawn Rux, in the sum of $471,327 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Olivia Rux (wife) in the sum of $471,327 plus interest as above set forth;

13. Timothy Sceviour, personal representative of Ronchester Mananga Santiago, in the sum of $315,416 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Rogelio Santiago (father) in the sum of $157,708 plus interest as above set forth, and Simeona Santiago (mother) in the sum of $157,708 plus interest as above set forth;

4

14. Timothy Sceviour, personal representative of Timothy Lamont Saunders, in the sum of $693,172 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jacqueline Saunders (wife) in the sum of $368,126 plus interest as above set forth, Isley Gayle Saunders (daughter) in the sum of $147,666 plus interest as above set forth, and Jocelyn Tiera Saunders (daughter) in the sum of $177,380 plus interest as above set forth;

15. Timothy Sceviour, personal representative of Gary Graham Swenchonis, in the sum of $283,550 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Gary G. Swenchonis (father) in the sum of $141,175 plus interest as above set forth, and Deborah Swenchonis (mother) in the sum of $142,375 plus interest as above set forth;

16. Timothy Sceviour, personal representative of Andrew Triplett, in the sum of $1,273,694 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Lorrie D. Triplett (wife) in the sum of $781,465 plus interest as above set forth, Andrea Triplett (daughter) in the sum of $220,561 plus interest as above set forth, and Savannah R. Triplett (daughter) in the sum of $271,668 plus interest as above set forth;

17. Timothy Sceviour, personal representative of Craig Brian Wibberly, in the sum of $306,978 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Thomas Wibberly (father) in the sum of $153,489 plus interest as above set

5

forth, and Patricia Wibberly (mother) in the sum of $153,489 plus interest as above set forth.

The judgments against Defendant Republic of Sudan total $7,956,344 plus interest as stated above.

The Clerk of the Court is DIRECTED to transmit a copy of this Order to all counsel of record via United States mail.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE

August 2, 2007
Norfolk, Virginia

6



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, et al.,

      Plaintiffs,

      v.

THE REPUBLIC OF SUDAN,

      Defendant.

      Civil Action No. 2:04cv428

## ORDER

Presently before the Court is Plaintiff Timothy P. Sceviour's Amended Petition for Entry of Order Directing the Clerk to Certify Judgment entered in his favor against Defendant, The Republic of Sudan, pursuant to Title 28 of the United States Code, Section 1963. For the reasons stated herein, Plaintiff's petition is **GRANTED** and the Court hereby **ORDERS** the registration of its July 25, 2007 judgment, as amended on August 2, 2007, for enforcement in the Northern District of California, the Western District of North Carolina, and the Southern District of New York.

## I.    PROCEDURAL HISTORY

In a Default Judgment entered on July 25, 2007, and amended on August 2, 2007, this Court awarded Plaintiff $7,956,344 as personal representative to the estates of seventeen American sailors who were killed during the October 12, 2000, terrorist bombing of the American warship U.S.S. Cole. Upon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, Sudan was held liable for its provision of material support and resources to Al Qaeda, which enabled the terrorist group to bring about the attack on the U.S.S. Cole. This

Court awarded damages pursuant to the Death on the High Seas Act ("DOHSA") and found that DOHSA provided the exclusive remedy for the wrongful deaths. The Court denied the remaining claims of the 59 individual plaintiffs for damages for loss of consortium, loss of solatium, loss of society, mental anguish and emotional distress, because each of these claims is non-pecuniary in nature and consequently cannot be recovered under DOHSA. The individual plaintiffs filed a Notice of Appeal on August 23, 2007, appealing that portion of the Final Opinion and Order that denied them recovery for intentional infliction of emotional distress. Defendant, The Republic of Sudan, has not appealed any part of the Opinion and Order and the time for appeal has now expired. Nor has the Defendant obtained a stay of execution or filed a supersedeas bond pending appeal, pursuant to Rule 62 of the Federal Rules of Civil Procedure. Plaintiff Timothy Soeviour now seeks to execute and collect on the judgment under DOHSA outside of the Eastern District of Virginia and in the Northern District of California, the Western District of North Carolina, and the Southern District of New York.

## II.    PLAINTIFF HAS SHOWN GOOD CAUSE TO REGISTER JUDGMENT

Section 1963 of Title 28 of the United States Code provides that a judgment may be registered for the purpose of enforcement in other districts when "ordered by the court that entered judgment for good cause shown," notwithstanding the pendency of an appeal. Good cause exists upon a "mere showing" that the defendant has substantial property in another district and insufficient property in the rendering district to satisfy the judgment. David D. Siegel, Commentary on 1988 Revision, 28 U.S.C.A. § 1963 (West 1994). See also United States v. D'Elegance Mgmt. Ltd., 217 F.3d 843 (4th Cir. 2000) (affirming registration of judgment where plaintiff stated results of an asset search in his motion to register); Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp., 128 F.R.D. 63 (D.N.J. 1989).

Here, Plaintiff Sceviour stated in his petition to register judgment that Plaintiffs' counsel had been unable to find any assets owned by Defendant in the Eastern District of Virginia. Counsel did, however, identify substantial property in other districts in the form of sums on deposit in bank accounts owned by Defendant. Plaintiff attached to its petition documents from the Office of Foreign Assets Control listing such accounts in the Northern District of California, the Western District of North Carolina, and the Southern District of New York. Plaintiff has thus shown good cause for registering the judgment and this Court hereby GRANTS Plaintiff Sceviour's petition and ORDERS the registration of its July 25, 2007 judgment, as amended on August 2, 2007, as set forth below:

1. Timothy Sceviour, as personal representative of Kenneth Eugene Clodfelter, in the sum of $498,462 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007, until paid in full, for the exclusive benefit of Jennifer Clodfelter (spouse) in the sum of $296,631 plus interest as above set forth, and Noah Clodfelter (son) in the sum of $201,831 plus interest as above set forth;

2. Timothy Sceviour, as personal representative of Richard Costelow, in the sum of $998,336 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate from July 25, 2007 until paid in full, for the exclusive benefit of Sharla Costelow (wife) in the sum of $549,658 plus interest as above set forth, and Ethan Costelow (son) in the sum of $235,309 plus interest as above set forth, and Brady Costelow (son) in the sum of $213,369 plus interest as above set forth;

3. Timothy Sceviour, as personal representative of Lakeina Monique Francis, in the sum

of $209,296 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Ronald Wallace Francis (father) in the sum of $104,648 plus interest as above set forth, and Sandra Annette Francis (mother) in the sum of $104,648 plus interest as above set forth;

4. Timothy Sceviour, personal representative of Timothy Lee Gauna, in the sum of $269,898 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Sarah Gauna Esquival (mother) in the sum of $269,898 plus interest as above set forth;

5. Timothy Sceviour, personal representative of Cherone Louis Gunn, in the sum of $272,620 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Louge Gunn (father) in the sum of $136,310 plus interest as above set forth, and Mona Gunn (mother) in the sum of $136,310 plus interest as above set forth;

6. Timothy Sceviour, personal representative of James Rodrick McDaniels, in the sum of $541,750 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of James Rodrick McDaniels, Jr. (son) in the sum of $329,162 plus interest as above set forth, and Diane McDaniels (mother) in the sum of $212,588 plus interest as above set forth;

7. Timothy Sceviour, personal representative of Marc Ian Nieto, in the sum of $362,411 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-

judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jesse Leroy Nieto (father) in the sum of $362,411 plus interest as above set forth;

8.  Timothy Sceviour, personal representative of Ronald Scott Owens; in the sum of $460,387 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Jamie Owens (wife) in the sum of $271,210 plus interest as above set forth, and Isabella Marie Owens (daughter) in the sum of $189,177 plus interest as above set forth;

9.  Timothy Sceviour, personal representative of Lakiba Nicole Palmer, in the sum of $529,376 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Capri Kumar (daughter) in the sum of $267,556 plus interest as above set forth, and Teresa Smith (mother) in the sum of $261,820 plus interest as above set forth;

10.  Timothy Sceviour, personal representative of Joshua Langdon Parlett, in the sum of $234,836 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Leroy Parlett (father) in the sum of $117,418 plus interest as above set forth, and Etta Parlett (mother) in the sum of $117,418 plus interest as above set forth;

11.  Timothy Sceviour, personal representative of Patrick Howard Roy, in the sum of $234,835 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Kate Brown (mother) in the sum of $234,835 plus interest as above set forth;

12.  Timothy Sceviour, personal representative of Kevin Shawn Rux, in the sum of $471,327 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,

and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the
exclusive benefit of Olivia Rux (wife) in the sum of $471,327 plus interest as above set forth;

13.  Timothy Sceviour, personal representative of Ronchester Mananga Santiago, in the
sum of $315,416 plus interest at eight (8) percent per annum from October 12, 2000, to July 25,
2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full,
for the exclusive benefit of Rogelio Santiago (father) in the sum of $157,708 plus interest as
above set forth, and Simeona Santiago (mother) in the sum of $157,708 plus interest as above set
forth;

14.  Timothy Sceviour, personal representative of Timothy Lamont Saunders, in the sum
of $693,172 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,
and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the
exclusive benefit of Jacqueline Saunders (wife) in the sum of $368,126 plus interest as above set
forth, Isley Gayle Saunders (daughter) in the sum of $147,666 plus interest as above set forth,
and Jocelyn Tiera Saunders (daughter) in the sum of $177,380 plus interest as above set forth;

15.  Timothy Sceviour, personal representative of Gary Graham Swenchonis, in the sum
of $283,550 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,
and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the
exclusive benefit of Gary G. Swenchonis (father) in the sum of $141,175 plus interest as above
set forth, and Deborah Swenchonis (mother) in the sum of $142,375 plus interest as above set
forth;

16.  Timothy Sceviour, personal representative of Andrew Triplett, in the sum of
$1,273,694 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007,
and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the

exclusive benefit of Lorrie D. Triplett (wife) in the sum of $781,465 plus interest as above set forth, Andrea Triplett (daughter) in the sum of $220,561 plus interest as above set forth, and Savannah R. Triplett (daughter) in the sum of $271,668 plus interest as above set forth;

17.  Timothy Sceviour, personal representative of Craig Brian Wibberly, in the sum of $306,978 plus interest at eight (8) percent per annum from October 12, 2000, to July 25, 2007, and post-judgment interest at the applicable post-judgment federal rate until paid in full, for the exclusive benefit of Thomas Wibberly (father) in the sum of $153,489 plus interest as above set forth, and Patricia Wibberly (mother) in the sum of $153,489 plus interest as above set forth.

The judgments against Defendant Republic of Sudan total $7,956,344 plus interest as stated above.

The Clerk of the Court is DIRECTED to fax and forward copies of this Order to counsel of record for all parties.

IT IS SO ORDERED.

UNITED STATES DISTRICT JUDGE

October 11, 2007
Norfolk, Virginia

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OLIVIA RUX, et al.,

    Plaintiffs,

      v.                              Civil Action No. 2:04cv428

THE REPUBLIC OF SUDAN,

    Defendant.

## OPINION & ORDER

This action arises from the October 12, 2000, terrorist bombing of the American warship U.S.S. Cole during a temporary refueling stop in the Port of Aden, Yemen, in which seventeen American sailors were killed. Plaintiffs Olivia Rux, *et al.* ("Plaintiffs"), more than fifty surviving family members of the deceased sailors, allege that Defendant Republic of Sudan ("Sudan") is liable for damages from the attack because it provided material support and assistance to Al Qaeda, the terrorist organization whose operatives planned and carried out the attack. Plaintiffs have brought this action pursuant to the Foreign Sovereign Immunities Act ("FSIA"), *inter alia*, 28 U.S.C. § 1605(a)(7), which establishes subject matter jurisdiction for personal injury or death resulting from acts of state-sponsored terrorism. Upon evidence adduced at a non-jury trial before this Court on March 13-14, 2007, the Court concludes that judgment shall be entered for Plaintiffs.

## I.    BACKGROUND

Plaintiffs initiated this action against Sudan on July 16, 2004. Sudan failed to appear to defend the suit, and a default was entered on February 16, 2005. The Court vacated the entry of default after Sudan made a general appearance and Sudan filed a motion to dismiss Plaintiffs'

Complaint. This Court denied the motion on August 26, 2005.[1] On September 1, 2006, the United States Court of Appeals for the Fourth Circuit affirmed this Court's denial of Sudan's motion to dismiss for lack of subject matter jurisdiction. Rux v. Republic of Sudan, 461 F.3d 461, 465-66 (4th Cir. 2006), cert. denied, No. 06-772, 127 S.Ct. 1325 (2007). Pursuant to this Court's August 26, 2005, order, Sudan was required to answer the Complaint not more than three days from the date of the issuance of the mandate from the Court of Appeals. After failing to have Plaintiffs' Complaint dismissed in its entirety, Sudan notified the Court by letter on October 25, 2006, that it would "not defend or otherwise participate in this proceeding on the merits." Def.'s Letter of Oct. 25, 2006. The deadline to file an Answer expired on October 27, 2006, without a response from Sudan. On November 2, 2006, this Court ordered Sudan to file an Answer or other responsive pleading within twenty-one days. Sudan again did not respond. In light of Sudan's refusal to participate, the clerk entered default against Sudan on February 2, 2007. However, pursuant to 28 U.S.C. § 1608(e), Plaintiffs were required to submit evidence "satisfactory to the court" before a default judgment against Sudan could be entered. 28 U.S.C. § 1608(e).

Prior to trial, Plaintiffs amended their Complaint to add claims under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. app. §§ 761-767, and assert claims for intentional infliction of emotional distress and maritime wrongful death. Sudan filed a motion to dismiss the intentional infliction and maritime wrongful death claims for failure to state a claim upon which relief can be granted on grounds that DOHSA provides an exclusive remedy. The Court

---

[1] The Court denied Sudan's motion on all grounds except failure to state a claim upon which relief can be granted, which it took under advisement until Sudan was to file an Answer.

2

denied Sudan's motion at that time and reserved ruling on the choice of law and exclusivity of

remedy questions. The case was tried to this Court, sitting without a jury, on March 13-14,

2007. Counsel for Sudan attended the trial but did not participate other than to make a brief

argument at the end of trial regarding damages and to renew its motion to dismiss. (Tr. 201:25-

202:3). The Court concluded at the end of trial that there existed sufficient evidence to enter

default judgment against Sudan pursuant to 28 U.S.C. § 1608(e). This Opinion and Order details

the Court's factual findings and conclusions of law. Fed. R. Civ. P. 52(a).

## II.    FINDINGS OF FACT

### A.    Legal Standard for FSIA Default Judgment

The FSIA requires that a default judgment against a foreign state be entered only after a

plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C.

§ 1608(e). This provision requires the court to satisfy itself that there exists an adequate legal

and factual basis for plaintiffs' claims. Owens v. Republic of Sudan, 374 F. Supp. 2d 1, 8-9

(D.D.C. 2005). In default judgment proceedings, plaintiffs may present evidence in the form of

affidavits. Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 82 (D.D.C. 2006);

Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 268 (D.D.C. 2003). Upon

evaluation, the court "may accept plaintiffs' uncontroverted evidence as true." Id.

In accordance with this relaxed evidentiary standard, the Court finds the following facts

based on Plaintiffs' uncontroverted evidence, which consists of 183 exhibits including various

depositions and live witness testimony. The exhibits relevant to the Court's finding of liability

include transcripts of depositions taken by Plaintiffs of terrorism experts. R. James Woolsey was

an expert who appeared voluntarily without compensation. Mr. Woolsey was the Director of

3

U.S. Central Intelligence from 1993 to 1995 and is now a Vice President at Booz Allen Hamilton in McLean, Virginia. Douglas Farah, the President of IBI Consultants, LLC, and a former reporter for the *Washington Post* in West Africa who has studied and written extensively on terror finance and radical Islamic groups, was another expert. Also deposed were Steven Emerson, Executive Director of The Investigative Project on Terrorism and an expert on Islamic extremist networks, and Lorenzo Vidino, a Research Program Manager at the Jebsen Center for Counter-Terrorism Studies at The Fletcher School of Tufts University. The evidence also includes unclassified U.S. Department of State reports; the 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States ("the 9/11 Commission Report"); a five-volume U.S. Department of the Navy report documenting the Navy's investigation into the Cole attack (the "Navy Report"); and a transcript of federal criminal proceedings against Osama Bin Laden in 2001.

**B.    The Attack on the U.S.S. Cole in the Port of Aden, Yemen[2]**

At approximately 8:30 a.m. on October 12, 2000, the U.S.S. Cole ("Cole") entered the Port of Aden, Yemen, to temporarily stop for refueling. The Republic of Yemen is a country of 203,850 square miles located on the southern coast of the Arabian Peninsula. Aden is a city of approximately 440,000 located on Yemen's south coast. The Port of Aden is a natural harbor with a deep draft in most areas and natural land protection on all sides. In February 1999, the Navy began using Aden instead of Djibouti as the primary refueling stop for American ships

---

[2]This section is largely based on the Navy report, which describes the attack and its aftermath in extraordinary detail. See Ex.158, Investigation to Inquire Into the Actions of USS Cole (DDG 67) In Preparing For And Undertaking a Brief Stop For Fuel at Bandar at Tawahi (Aden Harbor) Aden, Yemen, On Or About 12 October 2000.

during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea. Under a contract entered into between the United States and Yemen, U.S. Navy vessels could obtain fuel at one of two fueling "dolphins" located near the mouth of the harbor without going to the pier.

The Cole, an Arleigh Burke Class Destroyer, was the twenty-fifth Navy ship to stop in Aden Harbor for refueling over the previous nineteen months. As of October 2000, the ship had a crew of twenty-six officers and 270 enlisted personnel. The Cole departed from its home port of Norfolk, Virginia, on August 8, 2000, before patrolling the Mediterranean Sea. On October 9, 2000, the ship transited the Suez Canal and headed for Yemen. At the time that the ship entered the Port of Aden on October 12, 2000, the U.S. Department of Defense terrorist threat level in Aden was "Threat Condition (THREATCON) BRAVO," which indicated an "increased and more predictable threat of terrorist activity."

At approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor. The ship began refueling at approximately 10:31 a.m. At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city. The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull. It looked "brand new." (Ex. 158 at 70.) The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole. The boat was manned by two males, both of whom appeared to be in their early thirties. The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft. As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting. Seconds later, the boat

5

exploded.

The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch. The blast ripped a thirty-two- by thirty-six-foot hole in the port side. One sailor sleeping in his bed "was awakened by a loud explosion and thrown upward about three inches. I didn't know what happened, but I knew that anything that could throw me out of my rack had to be bad." (Id. Encl. 66 at 1.) Smoke, dust, and fuel vapors filled the air. The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded. Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed. The blast and its after-effects killed seventeen Navy sailors, all of them American citizens. Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

C.     The Decedents and Plaintiffs

Plaintiffs are fifty-nine surviving family members of the seventeen sailors who died. Seven of the plaintiffs are the surviving spouses or permanent companions of a deceased sailor, nineteen are siblings of a decedent, twenty-three are parents, and ten of the plaintiffs, on whose behalf suit is brought by the next friend of each, are minor children. The seventeen decedents are the following:

1. Kenneth Eugene Clodfelter, age twenty-one. Mr. Clodfelter, a hull technician, is survived by his wife, Jennifer Clodfelter; his minor son, Noah Clodfelter, now eight; his parents, John and Gloria Clodfelter; and his younger brother, Joseph Clodfelter, all of them plaintiffs.

2. Richard Costelow, age thirty-five. Mr. Costelow, a Chief Petty Officer specializing in electronics and communications, left behind his wife, Plaintiff Sharla Costelow; his parents,

6

Plaintiffs George and Dorothy Costelow; and his two minor sons, Plaintiffs Ethan Costelow and Brady Costelow.

3. Lakeina Monique Francis, age nineteen. Ms. Francis, of North Carolina, was a mess specialist aboard the Cole. Her survivors are her parents, Plaintiffs Ronald Wallace Francis and Sandra Annette Francis; and her younger brothers Plaintiffs David Francis, and James Winston Francis, III.[3]

4. Timothy Lee Gauna, age twenty-one. Mr. Gauna handled electronic communications aboard the Cole. He is survived by his mother, Plaintiff Sarah Gauna-Esquivel.

5. Cherone Louis Gunn, age twenty-two. Mr. Gunn, a signalman apprentice from Virginia, left behind his parents, Plaintiffs Louge Gunn and Mona Taylor Gunn; and his three brothers, Plaintiffs Jason Gunn, Jamal Gunn, and Anton J. Gunn.

6. James Rodrick McDaniels, age nineteen. Mr. McDaniels, a Virginia native who handled communications aboard the Cole, is survived by his fiancée, Plaintiff Novella Wiggins; his son, Plaintiff James Rodrick McDaniels, Jr.; his mother, Plaintiff Diane McDaniels; his sister, Plaintiff Frederica McDaniels-Bess; and two brothers not party to this suit.

7. Marc Ian Nieto, age twenty-four. Mr. Nieto, a mechanic born in Illinois, is survived by his father, Plaintiff Jesse Leroy Nieto.

8. Ronald Scott Owens, age twenty-four. Mr. Owens, an Electronic Warfare Technician, was survived by his wife, Plaintiff Jamie Owens, and daughter, Plaintiff Isabella Marie Owens,

---

[3]Presumably due to oversight, Plaintiffs David Francis and James Winston Francis, III, are not named in the body of the Fourth Amended Complaint. However, both of them were added as plaintiffs on November 12, 2004, and are named in the caption of the Fourth Amended Complaint. The Court will deem the Fourth Amended Complaint to include both of them.

now eleven.

9. Lakiba Nicole Palmer, age twenty-two. Ms. Palmer, a cook aboard the Cole, was survived by her daughter, Plaintiff Capri Kumar, now seven; her brother, Plaintiff Kenyon Embry; and her mother, Plaintiff Teresa Smith.

10. Joshua Langdon Parlett, age nineteen, was a fireman/engineman aboard the Cole. His survivors are his parents, Plaintiffs Leroy Parlett and Etta Parlett, and his siblings, Plaintiffs Kera Miller, Hannah Parlett, and Matthew Parlett.

11. Patrick Howard Roy, age nineteen. Mr. Roy, a fireman aboard the Cole, was survived by his mother, Plaintiff Kate Brown, and his brothers, Plaintiffs Sean Walsh and Kevin Michael Roy.

12. Kevin Shawn Rux, age thirty. Mr. Rux, who had served twelve years in the military and specialized in electronic warfare, was survived by his wife, Plaintiff Olivia Rux.

13. Ronchester Mananga Santiago, age twenty-two. Mr. Santiago, a Third Class Petty Officer from San Diego, California, was survived by his parents, Plaintiffs Rogélio Santiago and Simeona Santiago.

14. Timothy Lamont Saunders, age thirty-two. Mr. Saunders, a Second Class Petty Officer and operations specialist, was survived by his wife, Plaintiff Jacqueline Saunders, and his minor daughters, Plaintiffs Isley Gayle Saunders, now seventeen, and Jocelyn Tiera Saunders, now thirteen.

15. Gary Graham Swenchonis, age twenty-six. Mr. Swenchonis, an engineer, left behind his parents, Plaintiffs Gary G. Swenchonis and Deborah Swenchonis, and his sister, Plaintiff Shalala Swenchonis-Wood.

8

16. Andrew Triplett, age thirty-one. Mr. Triplett, an engineman who had spent thirteen years in the Navy, was survived by his wife, Plaintiff Lorrie D. Triplett; his two daughters, Plaintiffs Andrea Triplett, now fourteen, and Savannah R. Triplett, now ten; his parents, Plaintiffs Reed Triplett and Savannah Triplett; and his siblings, Plaintiffs Kevin Triplett, Wayne Triplett, Freddie Triplett, and Theodis Triplett..

17. Craig Brian Wibberly, age nineteen. Mr. Wibberly was survived by his parents, Thomas Wibberly and Patricia Wibberly, and his sister, Toni Wibberly, all of them plaintiffs.

Many of the Plaintiffs learned of the attack the day it occurred from the television news, or from friends or relatives. Some families were visited by military personnel at their homes and told that their loved ones were "presumed missing." They waited anxiously, many of them for days, before being told that in fact their loved one had died. Each of the Plaintiffs suffered upon learning that their husband, son, daughter, or sibling had been murdered in a terrorist attack. As Sarah Gauna-Esquivel, Timothy Lee Gauna's mother, testified, "It was like somebody just yanked all your insides out, and part of me died when I lost my son." (Ex. 116 at 17:4-5.) Diane McDaniels testified, "[I] had a nervous breakdown. I couldn't eat, couldn't leave the house, couldn't do nothing, couldn't walk." (Ex. 122 at 14:21-23.) Plaintiff Louge Gunn, a trauma and grief counselor for the U.S. Department of Veterans Affairs, testified that he "went into a panic" when he learned that his son Cherone was killed. "I fell to the floor on my knees. And I mean it was the most devastating thing that ever happened in my life. And I don't know, at the time I just felt like somebody had put their hand inside my body and grabbed me from the inside and pulled my skin inside. That's how much pain I was in at the time." (Tr. at 29:23-30:5.) It took several days for many of the decedents' bodies to be recovered in Yemen and sent back to the

9

families in the United States. Some families held multiple funerals as additional body parts were recovered, identified, and sent home for burial.

Years after the attack, the parents, wives, husbands, children, and siblings of the brave servicemen and women murdered on October 12, 2000, continue to suffer an unimaginable loss. Many of the Plaintiffs experience depression, among other emotional and physical ailments that, they testified, began in the aftermath of the attack. To assist these relatives of the decedents, the Navy and the Department of Veterans Affairs have distributed lump-sum survivor benefits and other compensation to many Plaintiffs.[4]

### D.    Sudan and Al Qaeda

Sudan is a country of 41.2 million inhabitants at the east end of the Sahara desert in northern Africa.[5] Sudan is bounded on the northeast by the Red Sea. Directly across the Red Sea from Sudan is the Republic of Yemen, and the span between the two countries can be easily crossed by boat. (Ex. 156 at 7-15.) Sudan's population is a majority Sunni Muslim, most of whom are in the north. The country has for years been ravaged by war and humanitarian crises, including an ongoing conflict that began in the mid-1980s between the Muslim government in the north and rebels in the rural south, which is populated largely by tribal and Christian groups. A rebellion in the Darfur region of western Sudan that began in 2003 has led to the deaths of at

---

[4]By statute as of 2000, eligible survivors of members of the armed forces who die in active duty were entitled to a death gratuity payment of $6,000. See 10 U.S.C. §§ 1475, 1477-78. The statutory death gratuity benefit was increased to $100,000 in 2006. See National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136 (2006).

[5]See generally U.S. Department of State, Bureau of African Affairs, Background Note: Sudan, March 2007, http://www.state.gov/r/pa/ei/bgn/5424.htm (last visited July 23, 2007); The World Almanac and Book of Facts 830-31 (2007).

least 200,000 people and forced more than two million to flee to refugee camps.

In 1989, General Omar Bashir assumed the presidency of Sudan in a military junta that overthrew the elected government and converted Sudan into an Islamic Arab state. Bashir remains Sudan's President today. The coup was orchestrated by Hassan Abdallah Turabi, head of the Sudanese political party the National Islamic Front ("NIF") and leader of the Muslim Brotherhood. Turabi was the regime's de facto leader from 1989 until late 1999, when he was ousted and later put in jail. (Exs. 15 & 154 at 18; Tr. 68, 121:4-5.) During the 1990s, Turabi and the NIF transformed Sudan into a centralized, radical Islamic state that openly supported movements and organizations with militant Islamic, anti-American, anti-Western ideologies. (Exs. 153 at 12 & 154 at 18-19.) Since 1993, the United States has continuously designated Sudan as a state sponsor of terrorism. 58 Fed. Reg. 52523-01 (Oct. 8, 1993). In 1996, the United States imposed comprehensive economic, trade, and financial sanctions against Sudan. That same year, the United Nations Security Council approved sanctions against Sudan for its alleged connections to the attempted assassination of Egyptian President Hosni Mubarak.[6]

Al Qaeda is a worldwide terrorist network led by Osama Bin Laden that has declared war against the United States and others who do not share its militant brand of Islam.[7] Al Qaeda was founded by Bin Laden in Afghanistan in approximately 1990 to serve as a base for like-minded Sunni Islamic extremists. (Ex. 22.) During the Afghanistan war from 1979 to 1989, Bin Laden, the son of a wealthy Saudi construction magnate, organized and financed the recruitment and

---

[6] See S.C. Res. 1044, U.N. Doc. S/RES/1044 (Jan. 31, 1996); S.C. Res. 1054, U.N. Doc. S/RES/1054 (April 26, 1996); S.C. Res. 1070, U.N. Doc. S/RES/1070 (Aug. 16, 1996).

[7] Bin Laden and Al Qaeda are spelled various ways. The Court uses "Bin Laden" and "Al Qaeda" herein for consistency.

11

training of Arab nationals to fight alongside the Afghan mujahadin against the Soviets. (Ex. 17.) As is well known today, Al-Qaeda has organized, executed or inspired acts of terrorism around the world that killed or injured thousands of innocent people, including the September 11, 2001, attacks on the United States. (Exs. 28 & 77 at 70.) Al Qaeda has supported terrorists in Afghanistan, Bosnia, Chechnya, Tajikistan, Somalia, Yemen, and Kosovo, and has trained terrorists from countries including the Philippines, Algeria, and Eritrea. (Ex. 23.)

Following the Soviet withdrawal from Afghanistan in 1989, Bin Laden's group was no longer welcome in Afghanistan. Bin Laden briefly returned to his home country of Saudi Arabia but was expelled in 1990 for his continued support of terrorism. (Id.) At a time when Al Qaeda found itself without a territory from which it could base its terrorist operations, Turabi offered the organization refuge in Sudan. As stated by a 1996 U.S. Department of State report on Bin Laden, Bin Laden "relocated to Sudan in 1991, where he was welcomed by National Islamic Front (NIF) leader Hasan al-Turabi." (Ex. 17.) Bin Laden lived in Sudan from 1991 until May 1996, when he was expelled from the country under international pressure. He then relocated to Afghanistan. (Exs. 23 & 77 at 57, 109.)

Turabi and Bin Laden shared a common extremist ideological and religious outlook. (Ex. 77 at 61.) Turabi, who was dean of the University of Khartoum law school in the 1960s, envisioned a pan-Islamic force consisting of both Shiites and Sunnis to counterbalance Western powers militarily, economically, and politically. (Ex. 154 at 25, 27.) As the de facto leader of the Sudanese regime, Turabi sought to impose *sharia*, or Islamic law, as the only source of law in Sudan, a goal shared by Al Qaeda. (Tr. 71:9-24.) Bin Laden agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest

12

his wealth in the poor country's infrastructure. (Exs. 154 at 21-23 & 77 at 57; Tr. at 73:11-14.) In exchange, Sudan provided Bin Laden's fledgling terrorist group with a sanctuary within which it could freely meet, organize, and train militants for operations. (Tr. at 73.)

Bin Laden established several joint business ventures with the Sudanese regime that began to flourish upon his arrival in the Sudanese capital of Khartoum in 1991. (Ex. 17.) As stated by the U.S. Department of State, Bin Laden "formed symbiotic business relationships with wealthy NIF members by undertaking civil infrastructure development projects on the regime's behalf." (Id.) Bin Laden's businesses in Sudan included (1) Al-Hijrah for Construction and Development, Ltd., which built the Tahaddi road between Khartoum and Port Sudan on the Red Sea coast, as well as a modern international airport near Port Sudan; (2) An import-export firm, Wadi al-Aqiq Company, Ltd., which, in conjunction with Bin Laden's Taba Investment Company, Ltd., and with the cooperation of prominent NIF members, secured a near monopoly over Sudan's agricultural exports of gum, corn, sunflower, and sesame products; and (3) Al-Themar al-Mubarak-ah Agriculture Company, Ltd., which acquired large tracts of land near Khartoum and in eastern Sudan. (Exs. 17 & 32 at 239, 241.) These businesses provided income to Al Qaeda, as well as cover for the procurement of explosives, weapons, and technical equipment, and for the travel of Al Qaeda operatives. (Exs. 24 & 77 at 57-58.) Bin Laden continued to maintain his substantial business interests and facilities in Sudan even after his departure to Afghanistan in 1996. (Exs. 23 & 156 at 26-27.)

Sudan allowed its banking institutions to be used by Al Qaeda to launder money. (Ex. 154 at 25.) Bin Laden and wealthy members of the NIF capitalized Al-Shamal Islamic Bank in Khartoum; Bin Laden personally invested $50 million in the bank. (Exs. 17 & 32 at 332.) In the

late 1980s, Sudan adopted an Islamic banking system that forbids interest and lacks the rigorous accounting standards used by Western banking systems. (Tr. 84:5-16; Ex. 154 at 36.) The lack of scrutiny associated with this system was ideal for Al Qaeda because it allowed the group to move large sums of money in support of its operations without detection. (Exs. 154 at 52 & 153 at 15.) As Mr. Farah, who is the author of "Blood From Stones: The Secret Financial Network of Terror," testified, Sudan "provided [Al Qaeda] fundamentally with a banking structure, Islamic structure that's out of the norm of the banking rules that we're acquainted with in the west, and allowed them channels to move money through that would be virtually undiscoverable to the outside world." He added that Sudan "clearly had control over the banking system . . . . [Al Qaeda] couldn't have operated with that degree of freedom and openness if they had not been sanctioned by the central government to do so." (Ex. 153 at 14-15, 26.)

In addition, as reported by the U.S. Department of State in its annual "Patterns of Global Terrorism" reports, the Sudanese military cooperated with Bin Laden and Al Qaeda to finance at least three terrorist training camps in northern Sudan by January 1994. (Ex. 17; Tr. 75:21-24.) Bin Laden's Al-Hijrah for Construction and Development company worked directly with Sudanese military officials to transport and provision the camps, where terrorists of Egyptian, Algerian, Tunisian, and Palestinian origin received training. From as early as 1997 to at least 1999, Sudan served as a "training hub" for Al Qaeda and other terrorist groups that used Sudan as a secure base for assisting compatriots elsewhere. Furthermore, starting as early as 1997 the Sudanese Government provided paramilitary training to terrorist organizations in Sudan.[8]

---

[8] See Ex. 17 State Department Fact Sheet on Bin Ladin, August 17, 1996; Ex. 22, *Patterns of Global Terrorism: 1997*, U.S. Department of State, April 1998 at 50; Ex. 25, *Patterns of Global Terrorism: 1998*, U.S. Department of State, April 1999; Ex. 28, *Patterns of Global*