Starting in the early 1990s, Turabi and the Sudanese regime convened annual conferences in Sudan under the label Popular Arab and Islamic Conference. At these conferences, Bin Laden and other top leaders and operatives from the most violent Islamic terrorist organizations, including Bin Laden's Islamic Army Shura, the Palestinian Liberation Organization, Hamas, and Hezbollah, congregated to exchange information and plan terrorist activities. (Exs. 77 at 61 & 154 at 26.) Turabi saw the conferences as a means of bringing together Sunnis and Shiites in the fight against the common enemy, i.e. the United States and other Western powers. (Ex. 77 at 61.) Mr. Woolsey testified that he was aware of the Popular Arab and Islamic Conference when he was Director of Central Intelligence in the early 1990s. He testified, "[W]e used to call it sort of the terrorist equivalent of the Paris Air Show. It was really quite remarkable. Those of us working in U.S. intelligence [never] thought that Sudan would be this blatant in pulling all of these terrorist organizations together in an annual conference." (Ex. 156 at 20). Although the conference was closed down in approximately 2000, Sudan "continued to be used as a safehaven" by Al Qaeda and other terrorist groups. (Ex. 35.)

As early as 1998, Sudan provided Al Qaeda members with Sudanese diplomatic passports as well as regular Sudanese travel documentation that facilitated the movement of Al Qaeda operatives in and out of Sudan. (Exs. 22; 25; 35; 154 at 31; 53 & 157 at 28.) Diplomatic passports allow the holder to pass through airport security in airports and ports around the world without his bags being checked and without the same level of scrutiny or searches normally given to regular passport holders. (Exs. 154 at 32 & 153 at 17). A diplomatic passport typically lasts between five and ten years (Ex. 154 at 33). Thus, these diplomatic passports issued in 1998

---

*Terrorism: 1999*, U.S. Department of State, April 2000.

would not have expired prior to 2003. The use of diplomatic passports allowed Al Qaeda agents to enter and leave Sudan and cross borders in other countries with diplomatic pouches carrying secret materials to prepare for attacks without arousing suspicion (Exs. 156 at 19; 154 at 33; 157 at 31 & 153 at 14). The Government of Sudan's provision of diplomatic passports to Al Qaeda, which was necessarily a government function carried out by Government officers or agents, was critical to Al Qaeda's method of training its operatives in one country and then dispatching them with their materials to other countries to carry out operations or await instructions. (Tr. 94:23-95:9). By giving Al Qaeda diplomatic passports, as well as diplomatic pouches that could be carried without inspection, Sudan enabled Al Qaeda to transport weapons and munitions outside the country and into other countries undetected by Customs agents. (Exs. 157 at 25; 153 at 18). As Mr. Woolsey testified, diplomatic passports "would permit them to move materials without scrutiny in a number of circumstances, and would, I think, be quite helpful in helping them prepare to—for any terrorist attack." (Ex. 156 at 19:2-6). In addition, Sudan exempted Al Qaeda and its members from paying any taxes or import duties and permitted it to bring containers into the country without inspection by Customs (Ex. 154 at 49-50; Ex. 32 at 238-39).

Sudan's support to Al Qaeda continued even after Bin Laden's expulsion from the country in 1996 and lasted at least until the Cole bombing in October 2000. As reported in the U.S. Department of State's annual "Patterns of Global Terrorism" reports, each year from 1997 through 2000 Sudan continued to serve as a meeting place, safe haven, and training hub for Al Qaeda and other terrorist groups including Lebanese Hizballah, Palestinian Islamic Jihad, Abu Nidal Organization, and Hamas. As of 1999, this support included "paramilitary training, money, religious indoctrination, travel, documents, safe passage, and refuge" and as of 2000 it

16

"included the provision of travel documentation, safe passage, and refuge. Most of the groups maintained offices and other forms of representation in the capital, using Sudan primarily as a secure base for organizing terrorist operations and assisting compatriots elsewhere." (Exs. 25 & 28.) Mr. Woolsey, who reviewed Plaintiffs' evidence, testified, "[M]y judgment, given the information I've seen here, and given my understanding of the propensities of these types of organizations in that part of the world, I'd say it's quite likely that there was cooperation between Sudanese government principally, probably through its intelligence services, and al-Qaida, as of late 2000." (Ex. 156 at 25.)

The strike against the Cole was part of a decade-long plan conceived and executed by Bin Laden and Al Qaeda to attack U.S. interests in the Middle East, specifically American military forces. (Ex. 72 at 29.) In early 1992, when he was based in Sudan, Bin Laden issued a fatwa that stated that U.S. forces stationed in the Arabian Peninsula, where Yemen is located, should be attacked. (Exs. 24; 54 at 28 & 77.) A fatwa is an Islamic religious decree which purports to direct Muslim followers to commit, or not to commit, certain acts. (Tr. 72:5-13.) Fatwas provided Al Qaeda with religious justification for its terrorist attacks. (Ex. 154 at 29.) By 1992, Bin Laden was well known and a senior figure among Islamic extremists. (Ex. 77 at 59.) At the time that Bin Laden issued his fatwa in 1992, the only American military presence in Yemen was that of Navy vessels refueling in Aden Harbor. (Ex. 154 at 28-30.) In that regard, the fatwa provided religious support for an attack directed at the U.S. Navy. (Id. at 29.) In December 1992, Al Qaeda operatives bombed two hotels in Aden, Yemen, occasionally used by U.S. military personnel, killing two tourists but no Americans. (Exs. 72; 17 & 77 at 59.) According to the 9/11 Commission Report, citing CIA and FBI intelligence reports, the

17

perpetrators of that 1992 attack "are reported to have belonged to group from southern Yemen headed by a Yemeni member of Bin Laden's Islamic Army Shura; some in the group had trained in an al Qaeda camp in Sudan." (Ex. 77 at 60 & n.44; Tr. 95:25-6:11.) In August 1996, Bin Laden issued a statement outlining Al Qaeda's goals: drive United States forces from the Arabian Peninsula, overthrow the Government of Saudi Arabia, "liberate" Muslim holy sites in "Palestine," and support Islamic revolutionary groups around the world. (Ex. 22.) On February 23, 1998, Bin Laden issued another fatwa that was published by allied groups under the name "World Islamic Front for Jihad Against the Jews and Crusaders." (Ex. 25.) The statement asserted that America had declared war against God and his messenger, and that the murder of any American, military or civilian, was the "individual duty for every Muslim who can do it in any country in which it is possible to do it." (Ex. 77 at 47.) Bin Laden also stated in February 1998, "If someone can kill an American soldier, it is better than wasting time on other matters." (Ex. 23.) By the time he issued his 1998 declaration of war, Bin Laden's organization had blossomed into a substantial, worldwide organization. (Ex. 77 at 55.) Less than a month after the fatwa was published, Al Qaeda operatives began planning the August 7, 1998, bombings of the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, which killed twelve Americans and 212 others, and injured about 5,000 others. (Id. at 69-70.) This was at a time when the Sudanese Government provided the diplomatic passports and military help in transporting materials used by Al Qaeda in its terrorist activities against the United States.

The Cole plot was an Al Qaeda operation supervised directly by Bin Laden. As stated in the 9/11 Commission Report, Bin Laden "chose the target and location of the attack, selected the suicide operatives, and provided the money needed to purchase explosives and equipment." (Id.

18

at 190.) Mr. Emerson and Mr. Vidino both testified that the attack's "mastermind" was Qaed
Salim Sinan al-Harethi, also known as Ali Qaed Sinan Harthi, who was one of Bin Laden's
bodyguards. (Tr. 108:6-7; Exs. 154 at 45-46 & 157 at 33.)[9] Mr. Emerson and Mr. Vidino both
testified that Al-Harethi was trained by Al Qaeda *in Sudan* in the 1990s before being dispatched
to Yemen where, according to Mr. Vidino, he became "the chief of operation[s] of Al Qaeda in
Yemen." (Tr. 108:10-20; Ex. 154 at 46.) Mr. Woolsey, the former CIA Director, testified that
"more likely than not" Sudan was the source of the explosives used in the Cole bombing. (Ex.
156 at 29.) Mr. Emerson testified, "I have no doubt the source [of the explosives used on the
Cole] came from Al Qaeda and was transported to Yemen from Al Qaeda or by the Sudanese
government through most probably the diplomatic pouch." (Ex. 157 at 26.) Mr. Farah testified
that his "best guess" as to the source of the explosives used in the Cole, based on his "studied
opinion and having discussed this case with intelligence officials," is Sudan, "which was the
closest place to Yemen in which they had the safe quarter in which to be able to move this type
of goods across the border." (Ex. 153 at 18-19.) In view of the foregoing, there is sufficient
evidence for purposes of the default judgment standard in 28 U.S.C. § 1610, and the Court
FINDS as a fact, that the explosives used in the Cole attack were sent by Al Qaeda operatives in
Sudan. This finding is corroborated by the testimony of one of Bin Laden's lieutenants in
Sudan, Jamal Al-Fadl, who testified in criminal proceedings against Bin Laden arising out of the

---

[9] *See also* Ex. 57, Michael Slackman, *Yemen Religious Leader Tied to* Cole, L.A. Times,
Jan. 15, 2003 (Harthi was "the man accused of organizing the suicide attack on the Cole"); Ex.
56, Elaine Monaghan & Daniel McGrory, *Death of Terror Chief Deals Severe Blow to al-Qaeda*,
The Times of London, Nov. 5, 2002 (al-Harethi was the "mastermind" behind the Cole, "a key
ally of Bin Laden and was on the FBI's most-wanted list"). Al-Harethi and five other Al Qaeda
operatives were reportedly killed in a missile strike fired from an unmanned U.S. aircraft in
November 2002. (Ex. 57.)

1998 embassy bombings. (Ex. 32, United States v. Bin Laden, Case No. 198CR1023, Trial Tr.
Feb. 6, 2001). Mr. Al-Fadl stated in sworn testimony in a trial before the United States District
Court for the Southern District of New York that he worked under Bin Laden in Sudan; that he
stored four crates of weapons and explosives at a farm in Sudan owned by Bin Laden; and that
he shipped the four crates in an Al Qaeda-owned boat from a facility owned by the Sudanese
military in Port Sudan to Yemen, where they were to be used to "fight the Communists." (Ex. 32
at 262, 336-40.)

Based on the expert testimony and documentary evidence, the Court FINDS as a fact that
Sudan, beginning in the early 1990s and continuing at least until 2000, actively provided Al
Qaeda with the support, guidance, Sudanese diplomatic passports and resources that allowed it to
transform into a sophisticated, worldwide terrorist network, and that such support was critical to
Al Qaeda developing the expertise, networks, military training, munitions, and financial
resources necessary to plan and carry out the attack that killed the seventeen American sailors on
the U.S.S. Cole. Each of the expert witnesses testified that the strike against the Cole would
likely not have occurred without Sudan's support and assistance to Al Qaeda in the form of safe
haven, military training, diplomatic passports, business partnerships, and lax banking and
accounting systems that facilitated money laundering. As Mr. Woolsey, the former CIA
Director, testified, the Cole attack "might have been possible, but it would not have been as
easy" without Sudan's support. Mr. Woolsey testified, "The proximity of Sudan to—to Yemen,
the need for a protected logistics infrastructure, the confused situation in the Government of
Yemen at the time . . ., the amount of explosives that needed to be put in the boat that attacked
the Cole, all that suggests to me that the logistical support and base of operations that could have

20

been available in Sudan could have been of substantial assistance to an attack in Yemen, such as the one that occurred." (Ex. 156 at 29.) Mr. Vidino testified that the bombing would have been "close to impossible" without Sudan's assistance because "simply all they needed, starting from the training to the explosives, to all what a terrorist cell needs, even the ideological aspect of it, came from Sudan. It was clearly necessary to have all these things in place to carry out an operation such as the attack on the Cole." (Tr. 112:12-17; Ex. 154 at 47-48.) Mr. Emerson testified that the Cole attack would not have occurred without Sudan. "You would have deprived them of the oxygen needed to operate." (Ex. 157 at 34.) Moreover, Mr. Farah testified, "I don't think the bombing of the Cole could have happened without the active support of the Government of Sudan. . . . I think that from 1992 through the Cole bombing, Sudan provided an incredibly necessary and vital infrastructure for Al-Qaeda to be able to prepare and move the explosives and carry out the attacks on the Cole. And it was not clandestine or hidden presence, but rather fairly overt and knowing presence by senior members of the NIF government in Sudan." (Ex. 97 at 14, 27-30.) The diplomatic passports and pouches utilized by Al Qaeda in furtherance of its terrorist activities were furnished by agents or officials of the Government of Sudan acting within the scope of their office, employment, or agency. Based on this testimony and the evidence supporting it, the Court FINDS as a fact by substantial evidence that Sudan's material support to Al Qaeda led to the murders of the seventeen American servicemen and women on October 12, 2000, in the territorial waters of Yemen.

III.    CONCLUSIONS OF LAW

    A.    Jurisdiction

The FSIA of 1976, 28 U.S.C. § 1602 et seq., provides the "sole basis for obtaining

jurisdiction over a foreign state in [federal] court[]." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L. Ed. 2d 818 (1989). Under the FSIA, foreign states enjoy immunity from suit in U.S. courts unless Congress waives immunity under an enumerated exception. 28 U.S.C. § 1604; see id. §§ 1605-1607. The exception at issue in this case is § 1605(a)(7), also known as the "terrorism exception," which was enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See Pub. L. No. 104-132, § 221, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 1605(a)(7)). Section 1605(a)(7) waives immunity of a foreign state in any case

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . .

§ 1605(a)(7). The terrorism exception has the following jurisdictional requirements: "(1) the provision of material support by a state sponsor of terrorism; (2) the provision of such support by an official of the state 'while acting within the scope of his or her office, employment, or agency'; and (3) a causal link between the material support and damage resulting from an act of terrorism." Rux, 461 F.3d at 467 (citing § 1605(a)(7)). The exception applies only if the foreign state against whom the suit is brought was designated as a state sponsor of terrorism by the U.S. Department of State at the time the act occurred or as a result of the act, the foreign state was afforded a reasonable opportunity to arbitrate the claim if the alleged act occurred in the foreign state against which the claim has been brought, and either the claimant or the victim was a national of the United States at the time of the alleged act. 28 U.S.C. § 1605(a)(7)(A) & (B)(i)-(ii).

22

The Court reaffirms its finding, which was affirmed by the Court of Appeals prior to submission of the evidence, that it has jurisdiction over the subject matter of this action. Rux, 461 F.3d at 467-75. Sudanese Government officials, employees, or agents acting within the scope of their office provided various forms of "material support" as defined in 18 U.S.C. § 2339A(b), including lodging, safehouses, financial services, false documentation, and transportation, to Al-Qaeda, whose operatives planned and carried out the Cole bombing. See 18 U.S.C. § 2339A(b)(1) (defining "material support or resources").[10] The deliberate murder of the seventeen American sailors qualifies as an "extrajudicial killing."[11] Jurisdictional causation under 28 U.S.C. § 1605(a)(7) is satisfied, as the evidence establishes a "reasonable connection between [Sudan's] provision of material support to [Al Qaeda] and the damage arising out of [the] terrorist attack" against the Cole. Rux, 461 F.3d at 473. Since 1993, the U.S. Department of State has designated Sudan as a state sponsor of terrorism in accordance with § 6(j) of the Export Administration Act, 50 U.S.C. § 2405(j). 58 Fed. Reg. 52523-01 (Oct. 8, 1993). The alleged acts occurred in a foreign state or states, so there is no arbitration requirement and, in any

---

[10]"Material support or resources" is defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials[.]" 18 U.S.C. § 2339A(b)(1); see § 1605(a)(7) (incorporating the definition of "material support or resources" from 18 U.S.C. § 2339A(b)(1)).

[11]An "extrajudicial killing" for purposes of § 1605(a)(7) is defined in § 1605(e)(1) as having the same meaning given to that term in section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, i.e., "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include such killing that, under international law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1605(a)(1); id. § 1350 note.

event, Plaintiffs made an offer to arbitrate on July 16, 2004 [Doc. No. 3]. Finally, the victims and claimants were nationals of the United States at the time of the alleged acts.

Personal jurisdiction over a non-immune sovereign exists so long as service of process has been made under § 1608 of the FSIA. 28 U.S.C. § 1330(b); see also Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40, 53-54 (D.D.C. 2006). As this Court previously concluded, Sudan waived personal jurisdiction, and service on Sudan was made in accordance with due process. See Order of Aug. 26, 2005 at 29-43 [Doc. No. 47]. The Court reaffirms its findings that it has *in personam* jurisdiction over Sudan and that venue is proper.

B.    Liability

While the FSIA vests jurisdiction in federal courts to hear cases against foreign states, it does not afford plaintiffs with a substantive cause of action. Thus, once a court determines that subject matter jurisdiction exists, it must determine what, if any, causes of action the plaintiff may bring against the defendant, and whether the foreign state is liable on any of those claims. See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1133-36 (D.C. Cir. 2004); Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir. 2004); Dammarell v. Islamic Republic of Iran, No. 01-2224, 2005 WL 756090 at *5 (D.D.C. Mar. 29, 2005) (Bates, J.).

The question of which law provides Plaintiffs with a cause of action presents issues of first impression because the Cole attack occurred in a foreign state's territorial waters, possibly bringing the matter within the scope of U.S. admiralty laws. Plaintiffs contend that liability should be governed by the common law of intentional infliction of emotional distress ("IIED") of the state of Virginia, which is the state of residence of at least one of the victims killed aboard

24

the Cole, as well as federal maritime wrongful death law as recognized by the United States Supreme Court in Moragne v. State Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed. 2d 339 (1970). Sudan contends that Plaintiffs' *only* cause of action arises under the Death on the High Seas Act of 1920 (DOHSA), 46 U.S.C. app. §§ 761-767, that "supplemental" claims for emotional distress or wrongful death are precluded by DOHSA and therefore must be dismissed, and that Plaintiffs' claims for non-pecuniary damages are not recoverable under DOHSA.[12]

On February 15, 2007, this Court held a hearing on the choice of law question. Sudan appeared at the hearing but did not participate. At the hearing, Plaintiffs argued that DOHSA was inapplicable because a foreign state is not a "person" under the statute and Congress did not intend the statute to apply to foreign sovereigns. Pl.'s Am. Mem. 2-6. At the Court's invitation, however, Plaintiffs filed a Fourth Amended Complaint adding claims under DOHSA and stating separate claims for IIED and maritime wrongful death. Although Sudan was in default, on February 27, 2007, it filed a motion to dismiss Plaintiffs' IIED and wrongful death claims for failure to state a claim upon which relief can be granted on grounds that they were precluded by DOHSA and did not satisfy DOHSA's three-year statute of limitations. 46 U.S.C. app. § 763a; Fed. R. Civ. P. 12(b)(6). The Court, ruling from the bench during the final pretrial hearing, denied Sudan's motion but reserved ruling on which substantive law applied to this action. At trial, Plaintiffs raised the matter again, urging the Court to rule that DOHSA's provision limiting damages to pecuniary losses is inapplicable to terrorism cases such as this, and that DOHSA should not be read to preclude recovery of non-pecuniary damages for emotional distress despite

---

[12]Sudan first made this argument in its August 3, 2005, motion to dismiss. The Court took it under advisement pending a ruling by the Court of Appeals on jurisdiction.

the case law interpreting DOHSA as an exclusive remedy. Following trial, Plaintiffs filed two "supplemental" memoranda in support of their argument.

The Court is faced with three overarching questions: (1) What choice of law rules apply to claims against a state sponsor of terrorism under § 1605(a)(7)?; (2) What substantive law provides Plaintiffs with a cause of action against Sudan?; and (3) Which law provides the applicable statute of limitations in cases brought under § 1605(a)(7)? Because this is the first case arising under the terrorism exception in this Circuit, and because the case law under this exception is still developing generally, the Court begins with a discussion of the choice of law principles to be applied in cases arising under § 1605(a)(7).

1.    Causes of Action Under the FSIA

The United States Court of Appeals for the District of Columbia Circuit held in Cicippio-Puleo that the FSIA is a jurisdictional statute and "neither 28 U.S.C. § 1607(a)(7) nor the Flatow Amendment [to the FSIA],[13] nor the two considered in tandem, creates a private right of action against a foreign government." 353 F.3d at 1033. Prior to Cicippio-Puleo, district courts had held or assumed that the terrorism exception or the Flatow Amendment provided the standard of liability against which a foreign state's actions should be measured. Id. at 1032 (citing cases). Cicippio-Puleo clarified that § 1605(a)(7) "merely waives the immunity of a foreign state without creating a cause of action against it." 353 F.3d at 1033. The liability of a foreign state

---

[13]The Flatow Amendment, enacted five months after the enactment of § 1605(a)(7), created a private right of action for conduct described in § 1605(a)(7) against "an official, employee, or agent of a foreign state" who was "acting within the scope of his or her office, employment, or agency . . . ." Pub. L. No. 104-208; Div. A, Title I, § 101(c), 110 Stat. 30009-172 (1996) (codified at 28 U.S.C. § 1605 note). See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 12 (D.D.C. 1998).

26

whose immunity has been abrogated under any of the exceptions in § 1605 is determined according to § 1606, which provides: "As to any claim for which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 1606; see First Nat'l City Bank v. Banco Para El Carcio Exterior de Cuba, 462 U.S. 611, 620, 103 S.Ct. 2591, 2597, 77 L. Ed. 2d 46 (1983) ("The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality . . . ."). Thus, a plaintiff proceeding against a state sponsor of terrorism under § 1605(a)(7) "must identify a particular cause of action arising out of a specific source of law." Acree v. Republic of Iraq, 370 F.3d 41, 59 (D.C. Cir. 2004) (holding the "generic common law" to be insufficient); see also Blais, 459 F. Supp. 2d at 54 (holding that § 1606 acts as a "pass-through" to substantive causes of action).

In Dammerell, the district court sought to answer a question left unresolved after Cicippio-Puleo and Acree, namely what "particular causes of action . . . may be brought against a foreign state in a case proceeding under section 1605(a)(7)." 2005 WL 756090 at *11. After a lengthy examination of the text, structure, and legislative history of §§ 1605(a)(7) and 1606, and a comparison to the analogous statutory scheme of the Federal Tort Claims Act, the Dammerell court concluded that "the causes of action that may be brought against the foreign state . . . include any claims that can be brought against a private individual in like circumstances," including claims arising under "state common and statutory law, federal statutory law, and even the law of a foreign state." Id. at *14. The court continued, "Whether any of these sources will furnish a cause of action in a particular case will depend on several factors, including the

27

governing choice of law analysis, . . . and at least in the context of federal statutory claims, a careful inquiry into congressional intent . . . . The crucial point, however, is that there is nothing in section 1605(a)(7) that displaces the prevailing rule that a plaintiff may bring existing causes of action through section 1606 against foreign states." Id. Following Cicippio-Puleo and Acree, the United States District Court for the District of Columbia has uniformly held that the state common or statutory laws of the state of the plaintiff's domicile may be used to determine the liability of foreign states under the terrorism exception. See, e.g., Blais, 459 F. Supp. 2d at 54–55 (applying state laws of battery and IIED); Reed v. Islamic Republic of Iran, 439 F. Supp. 2d 53, 65-68 (D.D.C. 2006) (Massachusetts law); Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 132-34 (D.D.C. 2005) (state law of assault, battery, and IIED); see also Virtual Dev. & Def. Int'l, Inc. v. Republic of Moldova, 133 F. Supp. 2d 9, 14 (D.D.C. 2001) ("[A]s a general matter, state substantive law is controlling in FSIA cases."). This precedent makes clear that a plaintiff proceeding against a state sponsor of terrorism under § 1605(a)(7) may bring a cause of action under state law, federal statutes, or, where appropriate, foreign law, as long as he or she "identif[ies] a particular cause of action arising out of a specific source of law." See Acree, 370 F.3d at 59.

The first step in a choice of law analysis is determining which choice of law rules to apply. In FSIA actions, courts are divided as to whether to apply the forum state's choice of law rules or federal common law. Compare Chuidian v. Philippine Nat'l Bank, 976 F.2d 561, 564 (9th Cir. 1992) and Harris v. Polskie Linie Lotnicze, 820 F.2d 1000, 1003 (9th Cir. 1987) (federal common law); with Barkanic v. Gen. Admin. of the Civil Aviation of the People's Republic of China, 923 F.2d 957, 960-61 (2d Cir. 1991) (finding that "forum law provides the

proper choice of law rules for FSIA cases"); see also 14A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3662, p. 321 (3d ed. 1998) ("[T]here is no clear understanding as to whether the forum state's choice-of-law rules should apply or whether federal common law should govern an action against a foreign state or instrumentality thereof.").

This case is unlike any other before it because it arose out of an attack against a U.S. warship in foreign territorial waters. The parties agree that the appropriate choice of law principles are those applicable to maritime torts derived from the United States Supreme Court's opinion in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L. Ed. 1254 (1953) and its progeny. Lauritzen set forth "several factors which, alone or in combination, are generally conceded to influence choice of law to govern a tort claim, particularly a maritime tort claim . . . ." 345 U.S. at 583, 73 S.Ct. at 928; see also Hawkspere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 234 (4th Cir. 2003) (holding that Lauritzen factors are to be applied by federal courts sitting in admiralty in the absence of a valid contractual choice of law). "Under Lauritzen, a court must consider seven factors in determining the governing law for a particular dispute: (1) the place of the wrongful act, if any; (2) the law of the flag; (3) the domicile of the plaintiff; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum." Id. (citing Lauritzen, 345 U.S. at 583-92, 73 S.Ct. at 932). The law of the flag is of "cardinal importance" and "supersedes the territorial principle . . . because [a ship] 'is deemed to be a part of the territory of that sovereignty (whose flag it flies), and not to lose that character when in navigable waters within the territorial limits of another sovereignty.'" Lauritzen, 345 U.S. at 584-85, 73 S.Ct. at 929-30 (quoting United

29

States v. Flores, 289 U.S. 137, 155-159, 53 S.Ct. 580, 584-86, 77 L. Ed. 1086 (1933)); see also Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 308, 90 S.Ct. 1731, 1734, 26 L. Ed. 2d 252 (1970) ("[T]he flag that a ship flies may, at times, alone be sufficient."). The place of the wrongful act escapes easy definition because the wrongful acts occurred in Sudan, Yemen, and the Port of Aden. Yet while the first factor is ambiguous, the remaining factors point overwhelmingly towards the law of the United States. This case involves an act of terrorism against an American warship flying the flag of the United States in which seventeen U.S. nationals were killed. The courts of Yemen and Sudan are plainly inaccessible to Plaintiffs, all of whom are themselves U.S. nationals and reside in the United States. Accordingly, United States law, rather than foreign law, supplies the rule of decision.

### 2.    Death on the High Seas Act

The next question is whether Plaintiffs' cause of action is based on a federal statute, i.e. DOHSA, federal maritime law, state common law or state statutes, or some combination thereof. Although many § 1605(a)(7) claims against foreign state sponsors of terrorism since Cicippio-Puleo have been based on state laws, courts have applied federal statutes against foreign states whose immunity was lifted pursuant to one of the exceptions in § 1605. See, e.g., Southway v. Cent. Bank of Nigeria, 198 F.3d 1210, 1216 (10th Cir. 1999) (federal Racketeering Influenced and Corrupt Organizations Act statute enforceable against a foreign state through the FSIA); Mukaddam v. Permanent Mission of Saudi Arabia, 111 F. Supp. 2d 457, 470 (S.D.N.Y. 2000) (foreign state "is liable under Title VII [of the Civil Rights Act of 1964] in the same manner and to the same extent as a private employer would be in like circumstances"); Outboard Marine Corp. v. Pezetel, 461 F. Supp. 384, 395-96 (D. Del. 1978) (suit against foreign government-

30

controlled entity under antitrust laws is cognizable through "commercial activity" exception of the FSIA, 28 U.S.C. § 1605(a)(2)). As the court in Dammerell recognized, whether a particular federal statute may be invoked against a foreign state is an "inherently delicate question, requiring a court to assess Congress's intent across several statutes: the federal statute giving rise to the cause of action; the relevant waiver of sovereign immunity in section 1605; and section 1606 itself." 2005 WL 756090 at *28.

The Death on the High Seas Act, 46 U.S.C. app. § 761 et seq. (reorganized and restated at 46 U.S.C. § 30301-30308), was enacted in 1920 in order to provide "a uniform and effective wrongful death remedy for survivors of persons killed on the high seas." Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 214, 106 S.Ct. 2485, 2490, 91 L. Ed. 2d 174 (1986).[14] Section 761(a) of the Act, as it existed at the time of the events giving rise to this suit, provides:

> [W]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

46 U.S.C. app. § 761(a). In enacting DOHSA, Congress repudiated the preexisting rule in The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L. Ed. 358 (1886), that no federal statute or general federal maritime law existed that afforded a wrongful death cause of action to the survivors of persons killed beyond state territorial waters. See The Hamilton, 207 U.S. 398, 404-05, 28 S.Ct. 133, 134-35, 52 L. Ed. 264 (1907) (pre-DOHSA case applying state wrongful death statutes to

---

[14]Congress repealed and recodified Title 46 effective October 6, 2006. Pub. L. No. 109-304, 120 Stat. 1485, 1512 (2006). A modified DOHSA is now at 46 U.S.C. § 30301-30308. Because the events at issue occurred in 2000, the version of DOHSA then in effect is applicable.

31

deaths on the high seas). DOHSA was intended to remedy "[t]he void that existed in maritime law up until 1920[:] the absence of any remedy for wrongful death on the high seas[.]" Moragne, 398 U.S. at 398, 90 S.Ct. at 1786 (overruling The Harrisburg); see also H.R. Rep. No. 674, 66th Cong., 2d Sess., 3-4 (1920).

Whether DOHSA may be invoked against a foreign state whose immunity has been abrogated under the FSIA is evidently an issue of first impression. The Court is unaware of a single case in which a foreign state was found liable in wrongful death under DOHSA, and no court has directly addressed whether such claims are cognizable.

To answer this question, the Court begins with the plain text of the statute. By its terms, DOHSA is limited to circumstances where death stems from a "wrongful act, neglect or default" which "occur[red] on the high seas beyond a marine league from the shore of any State . . . ." 46 U.S.C. app. § 761. The class of defendants is limited to "the vessel, person, or corporation which would have been liable if death had not ensued." Id. The class of beneficiaries is limited to the decedent's "wife, husband, parent, child, or dependent relative," id., and damages are limited to the "pecuniary loss sustained by the persons for whose benefit the suit is brought" unless death results from a commercial aviation accident. Id. §§ 761(b), 762.

Plaintiffs concede that DOHSA's geographic scope, as interpreted, includes foreign territorial waters and that the Port of Aden in Yemen falls within this scope. See, e.g., Howard v. Crystal Cruises, 41 F.3d 527, 529-30 (9th Cir. 1994) (territorial waters of Mexico are "high seas" under DOHSA); Azzopardi v. Ocean Drilling & Exploration Co., 742 F.2d 890, 892-94 (5th Cir. 1984) (English Channel); Mancuso v. Kimex, Inc., 484 F. Supp. 453, 455 (S.D. Fla. 1980) (Jamaican waters); see also 2 Benedict on Admiralty § 81b, pp. 7-7-7-8 n.18 (2007) ("It

32

appears to be settled that the term 'high seas' within the meaning of DOHSA is not limited to international waters, but includes the territorial waters of a foreign nation as long as they are more than a marine league away from any United States shore."). Plaintiffs, correctly in the Court's view, make no attempt to argue that terrorism falls outside the Act. Although this appears to be the first case under DOHSA involving material support of terrorism, such conduct certainly constitutes a "wrongful act" within the plain meaning of the term in § 761. For decades courts have applied the Act whenever death occurs on the high seas, whether caused by negligence or unseaworthiness, see, e.g., Zicherman v. Korean Air Lines Co., Ltd., 516 U.S. 217, 116 S.Ct. 629, 133 L. Ed. 2d 596 (1996) (DOHSA claim against airline brought by survivors of passenger killed when airline was shot down over Sea of Japan in Soviet missile attack); Whitaker v. Blidberg-Rothchild Co., 195 F. Supp. 420, 421-23 (E.D. Va. 1961) (vessel and its owner liable for death of drowned seaman); Kuntz v. Windjammer Barefoot Cruises, Ltd., 573 F. Supp. 1277, 1282 (D. Pa. 1983) (cruise company liable for fatal scuba-diving accident on high seas), or even intentional conduct, see, e.g., Bowoto v. Chevron Corp., Case No. C 99-02506, 2006 WL 2455761 at *5 (N.D. Cal. Aug. 22, 2006) (DOHSA "clearly" applied to a claim brought on behalf of Nigerian individuals allegedly killed by the Nigerian military because the deaths "occurred [on an oil drilling platform] off the Nigerian coast and well over one marine league from U.S. shore"); The Samnanger, 298 F. 620, 622 (D. Ga. 1924) (homicide). The circumstances of this case thus fall squarely within the ambit of DOHSA.

Plaintiffs' sole argument is that foreign states are not proper defendants under DOHSA. But this argument overlooks contrary precedent in this and other jurisdictions, relies on inapplicable cases, and is premised on a misapplication of the FSIA and the terrorism

33

exception.[15] First, Plaintiffs' argument that a foreign state is not a "person" under DOHSA is belied by the fact that the United States has been consistently subject to liability for wrongful death on the high seas under DOHSA since the enactment in 1946 of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., which waived the United States' immunity for actions in tort. See, e.g., United States v. Gavagan, 280 F.2d 319, 321 (5th Cir. 1960) (holding United States liable under DOHSA through the FTCA for deaths resulting from negligent rescue efforts on the high seas); Blumenthal v. United States, 189 F. Supp. 439, 446-47 (E.D. Pa. 1960) ("In the same manner as a private person is liable under the Death on the High Seas Act, so, too, is the Government under the Federal Tort Claims Act."); Moran v. United States, 102 F. Supp. 275, 279 (D. Conn. 1951) (holding that FTCA extended the right of action created by DOHSA to claims against the United States for personal injury and deaths on the high seas); see also Roberts v. United States, 498 F.2d 520, 525-26 (9th Cir. 1974) (noting that prior to 1960 amendments to Suits in Admiralty Act, 46 U.S.C. §§ 741 et seq., FTCA waived sovereign immunity for claims brought under general maritime law and DOHSA). As the Supreme Court has noted:

> As enacted in 1920, [DOHSA] provided a remedy against private parties but contained no waiver of sovereign immunity. That changed with the enactment of the FTCA, which waived the sovereign immunity of the United States for claims arising on the high seas under the DOHSA and the general maritime law.

Smith v. United States, 507 U.S. 197, 208, 113 S.Ct. 1178, 1185, 122 L. Ed. 2d 548 (U.S. 1993); see also Roberts, 498 F.2d at 525 n.8 ("The DOHSA merely creates a cause of action for

---

[15]That Plaintiffs amended their Complaint to add claims under DOHSA largely renders this argument moot. The Court addresses it here for the sake of clarity and because Plaintiffs raised it again in their supplemental briefs following trial.

wrongful maritime death where none previously existed; the act does not contain any provision waiving sovereign immunity."). Congress presumably was aware of these cases against the United States in 1976 when it enacted the FSIA, which lifted foreign sovereign immunity for certain categories of cases much the same way as the FTCA lifted the United States' immunity in certain tort cases. See St. Louis, I.M. & S. Ry. Co. v. United States, 251 U.S. 198, 207, 40 S.Ct. 120, 122, 64 L. Ed. 225 (1920) ("[C]ongress must be presumed to have known of its former legislation . . . and to have passed the new laws in view of the provisions of the legislation already enacted."). In enacting the FSIA, Congress prescribed "when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States and . . . when a foreign state is entitled to sovereign immunity." H. R. Rep. No. 94-1487, 94th Cong., 2d Sess. at 6, as reprinted in 1976 U.S.C.C.A.N. 6604; see Permanent Mission of India to the United Nations v. City of New York, ----U.S.----, ----, 127 S.Ct 2352, 2357 (2007) ("In enacting the FSIA, Congress intended to codify the restrictive theory's limitation of immunity to sovereign acts."); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L. Ed. 2d 81 (1983) (the Act "codifies, as a matter of federal law, the restrictive theory of sovereign immunity"). Prior to the FSIA, a waiver of sovereign immunity was necessary before a suit against a foreign state could have been brought, and courts deferred to the suggestions of the U.S. Department of State on whether to take jurisdiction over a particular suit. See id. at 486, S.Ct. at 1967 (citing The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 3 L. Ed. 287 (1812)). It is particularly instructive that the FTCA and the FSIA contain nearly identical language with respect to the standard of liability to be applied when immunity has been lifted. Compare 28 U.S.C. § 1346(b)(1) (providing that United States may be liable for tortious

35

acts or omissions of its employees acting within the scope of their office or employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred") with 28 U.S.C. § 1606 ("As to any claim for which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances . . . ."). To permit wrongful death suits against the United States under DOHSA pursuant to the waiver of immunity in the FTCA, but prohibit identical suits against *foreign* states pursuant to the analogous waiver in the FSIA, would defy logic. It would also be inconsistent with the FSIA, which was "not intended to affect the substantive law determining the liability of a foreign state or instrumentality," First Nat'l City Bank, 462 U.S. at 620, 103 S.Ct. at 2597, and the terrorism exception itself, which "does not impose liability or mention a cause of action," Cicippio-Puleo, 353 F.3d at 1034. Thus, contrary to Plaintiffs' assertion that DOHSA suits against foreign states are impermissible because Congress has not *specifically* singled out foreign states as potential defendants under the Act, it is unsurprising and entirely appropriate that Congress did not speak to DOHSA when it passed the FSIA in 1976 or when it added the terrorism exception in 1996.

The Court's conclusion that a foreign state may be sued under DOHSA finds further support in this Circuit's precedent interpreting the Act. In Gerding v. Republic of France, 943 F.2d 521 (4th Cir. 1991), personal representatives of a passenger who became ill and died aboard a French vessel off the Canary Islands sued the Republic of France, and French officials and agencies, under DOHSA and other statutes. Id. at 523-24. The Fourth Circuit affirmed the district court's finding that France was immune from suit under the FSIA without considering

36

what law to apply and without giving any indication one way or the other as to whether DOHSA could apply to a foreign state. In Boykin v. Bergesen D.Y. A/S, 835 F. Supp. 274 (E.D. Va. 1993) (Morgan, J.), this Court found that a Chinese corporation called China Steel was not entitled to immunity under the FSIA for the death of a merchant ship's master killed by a methane explosion on the high seas, and awarded pecuniary damages under DOHSA. Id. at 287 n.20. The Court added in a footnote, "Assuming *arguendo* that China Steel qualifies as a foreign state under the FSIA," it was still subject to suit under the waiver and commercial activity exceptions to the FSIA, 28 U.S.C. § 1605(a)(1) & (2)), suggesting that the DOHSA claim could proceed against China Steel even if it were a "foreign state" under the FSIA.

Plaintiffs' arguments as to why foreign states are not "persons" are not persuasive. The cases they cite construing the term "person" as used in the Due Process Clause and other statutes deal with plainly different circumstances. See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002) (holding that foreign state is not a "person" for purposes of the Due Process Clause). Moreover, Plaintiffs overlook that the Supreme Court has held that a foreign state may be a "person" under the Clayton Act even though the statute does not clearly define the term "person." See Pfizer, Inc. v. Gov't of India, 434 U.S. 308, 320, 98 S.Ct. 584, 591-92, 54 L. Ed. 2d 769 (1978). As the Court noted in Pfizer, the "word 'person,' is not a term of art with a fixed meaning wherever it is used" and "this Court has expressly noted that use of the word 'person' in the Sherman and Clayton Acts did not create a 'hard and fast rule of exclusion' of governmental bodies." Id. at 315-16, 98 S.Ct. at 589 (citing United States v. Cooper Corp., 312 U.S. 600, 604-05, 61 S.Ct. 742, 743, 85 L. Ed. 1071 (1941), superseded by

statute, 15 U.S.C. § 15a).[16]

The only terrorism exception case to which Plaintiffs cite for the proposition that DOHSA does not apply to foreign states, Alejandre v. Republic of Cuba, 996 F. Supp. 1239 (D.D.C. 1997), is likewise unavailing. Alejandre involved an action against the Republic of Cuba under the terrorism exception arising out of the Cuban Air Force's shooting down of two civilian planes over international waters in the Straits of Florida, which killed three United States nationals. Id. at 1242–47. Plaintiffs argue that Alejandre "would appear to be a case where DOHSA would apply if Sudan's contentions were correct" because the death occurred on the "high seas" under the Act. Pls.' Supp. Mem. at 3. Although the court did not apply DOHSA in Alejandre, this is because the opinion was issued several years before the D.C. Circuit's opinion in Cicippio-Puleo, and was grounded in the now-defunct assumption that § 1605(a)(7) provided a freestanding cause of action against state sponsors of terrorism. Not surprisingly in light of this fact, the post-Cicippio-Puleo issue of what substantive law to apply was never even raised.

For these reasons, the Court FINDS that DOHSA is among the sources of law that may be invoked against a foreign state under § 1605(a)(7) of the FSIA, that Plaintiffs have met the requirements of DOHSA in this suit against Sudan, and that Sudan is liable to Plaintiffs under DOHSA for the wrongful deaths of the seventeen sailors killed aboard the Cole.

3.    Maritime Wrongful Death and Intentional Infliction Claims

---

[16]The only case cited by Plaintiffs which remotely discusses whether foreign states may be sued under DOHSA, Nejad v. United States, 724 F. Supp. 753 (C.D. Cal. 1989), involved a suit against the United States and its contractors—not a *foreign* government. Moreover, though Nejad does state, "It is not disputed that, if a claim can be maintained, DOHSA provides the jurisdictional basis as against the *non-government defendants*," id. at 756 (emphasis added), this sentence, which is not elaborated upon in the opinion, cannot reasonably be read to mean that DOHSA does *not* provide a cause of action against a governmental defendant.

The Court next turns to Plaintiffs' argument that DOHSA does not preclude them from also bringing claims for wrongful death under the general maritime basis for recovery recognized in Moragne, and for intentional infliction of emotional distress under Virginia law. Plaintiffs assert that because no court has ever ruled that DOHSA's rules on damages apply to foreign states, the Court has a clean slate upon which to write. Plaintiffs contend that despite the plain language of DOHSA it would be unfair to limit their damages to pecuniary losses in light of prior cases against state sponsors of terrorism that awarded damages for emotional distress and other non-pecuniary losses. In Plaintiffs' view, DOHSA should not be construed to benefit a state sponsor of terrorism simply because the decedents happened to die on the high seas, and to hold otherwise would defeat the purpose of the terrorism exception. As a fallback argument, Plaintiffs contend that their claim for IIED is not preempted by DOHSA because it is not a "wrongful death" claim brought on behalf of the decedents, but rather a "separate" claim for Plaintiffs' own emotional distress experienced upon learning of the attack against the Cole.

Plaintiffs' arguments are unavoidably foreclosed by the plain text of DOHSA and the Supreme Court case law interpreting it. Section 762 of DOHSA provides that damages are limited to the "pecuniary loss sustained by the persons for whose benefit the suit is brought." § 762. DOHSA thus limits compensation "to prospective and material loss for the relief of others than the decedent—to reimbursement for the post-death, 'pecuniary' deprivation of his dependents." United States v. S.S. Washington, 172 F. Supp. 905, 908 (D. Va. 1959). The Supreme Court has held that survivors of a person killed on the high seas may not supplement the remedy under DOHSA with an action for loss of society damages, Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 624-25, 98 S.Ct. 2010, 2014-15, 56 L. Ed. 2d 581 (1978), or a

39

claim under a state's wrongful death statute for non-pecuniary damages. Tallentire, 477 U.S. at

232, 106 S.Ct. at 2499 (holding that Louisiana wrongful death statute was preempted by

DOHSA). The Court has also held that survival claims brought by a decedent's estate for pre-

death pain and suffering are precluded by DOHSA. Dooley v. Korean Air Lines Co., Ltd., 524

U.S. 116, 122-24, 118 S.Ct. 1890, 1894-95, 141 L. Ed. 2d 102 (1998). The Court based each of

these holdings on the principle that DOHSA

> announces Congress' considered judgment on such issues as the beneficiaries,
> the limitations period, contributory negligence, survival, and damages .... The
> Act does not address every issue of wrongful-death law, ... but when it does
> speak directly to a question, the courts are not free to 'supplement' Congress'
> answer so thoroughly that the Act becomes meaningless.

Higginbotham, 436 U.S. at 625, 98 S.Ct. at 2015 (finding that loss-of-society damages could not

be recovered by dependents of a longshoreman killed on the high seas).

That this case involves terrorism, and that it is against a foreign state sponsor of

terrorism, does not overcome the fact that DOHSA is an exclusive remedy. As the Supreme

Court has stated, Congress has "struck the balance for us. It has limited survivors to recovery of

their pecuniary losses." Id. at 623, 98 S.Ct. at 2014. And as the Court noted in Dooley, "By

authorizing only certain surviving relatives to recover damages, and by limiting damages to the

pecuniary losses sustained by those relatives, Congress provided the exclusive recovery for

deaths that occur on the high seas" and therefore "has precluded the judiciary from enlarging

either the class of beneficiaries or the recoverable damages" under DOHSA. 524 U.S. at 123,

118 S.Ct. at 1894-95. The Court's creation of a terrorism exception to DOHSA would not only

be contrary to the text of DOHSA, it would also undermine Congress' purpose of enacting a

uniform statutory remedy for wrongful death on the high seas. See Yamaha Motor Corp., U.S.A.

40

v. Calhoun, 516 U.S. 199, 215, 116 S.Ct. 619, 628, 133 L. Ed. 2d 578 (1996) (stating in reference to DOHSA, "When Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided.").[17]  Contrary to Plaintiffs' contention that the issue is open for judicial interpretation, "Congress has spoken directly to the question of recoverable damages on the high seas," Miles v. Apex Marine Corp., 498 U.S. 19, 31, 111 S.Ct. 317, 325, 112 L. Ed. 2d 275 (1990) (citing Higginbotham, 436 U.S. at 625, 98 S.Ct. at 2015), and this Court is in no position to rewrite the statute. See also Dooley, 524 U.S. at 124, 118 S.Ct. at 1895 ("Congress has spoken on . . . the losses to be recovered, and the beneficiaries, in cases of death on the high seas[.]").[18]

The Court is well aware that other plaintiffs in other cases brought under the terrorism exception have recovered damages that exceed those available under DOHSA.  But in every one of those cases following Cicippio-Puleo the plaintiffs' damages were determined according to

---

[17]Plaintiffs' Supplemental Memorandum offers two cases, but neither addresses the issue here, i.e. whether DOHSA preempts state-law claims for IIED.  See Wallis v. Princess Cruises, 306 F.3d 827, 842 n.5 (9th Cir. 2002) (finding that the court does "not need to reach Princess' alternative argument that the claim is preempted by DOHSA"); Cummings v. Holland Am. Line Westours, 1999 A.M.C. 2282, 1999 WL 1293577 at *3 (W.D. Wash. 1999) (dismissing negligent infliction of emotional distress claim "does not affect" IIED claims).  In fact, one court has noted that DOHSA preempts a separate action for negligent infliction of emotional distress. See Howard v. Crystal Cruises, Inc., 1992 A.M.C. 1645, 1654, 1992 WL 194659 (E.D. Cal. 1992).

[18]Because DOHSA is an exclusive remedy, the Court need not decide whether Plaintiffs may pursue a claim against Sudan based on the maritime remedy in Moragne.  However, it bears noting that Plaintiffs have offered no support for the proposition, implicit in their Fourth Amended Complaint, that Moragne, which held that general maritime law provided a cause of action for wrongful death in *U.S. state territorial waters*, see 398 U.S. at 409, 90 S.Ct. at 1792, should be extended to this case, which involved deaths in the territorial waters of Yemen.

the applicable substantive law, which is precisely what 28 U.S.C. § 1606 of the FSIA requires.
See Blais, 459 F. Supp. 2d at 58 (holding that plaintiffs "are entitled to the typical bases of
damages that may be awarded against tortfeasors under the laws of Florida and Virginia");
Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 105 (D.D.C. 2006) (awarding
"typical array of damages" under California law); Price, 384 F. Supp. 2d at 134 ("Because
section 1606 of the FSIA provides that a 'foreign state shall be liable in the same manner and to
the same extent as a private individual under like circumstances,' 28 U.S.C. § 1606, plaintiffs are
entitled to the typical array of compensatory damages that may be awarded against tortfeasors in
Texas and California . . . ."); see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C.
Cir. 2003) (noting that § 1606 empowers judges to "find the relevant law, not to make it").
Plaintiffs' theory that family members of victims of terrorism are themselves victims may be true
as a factual matter, but, unfortunately, as a legal matter it does not circumvent the Supreme
Court's holdings on DOHSA. Plaintiffs assert that Beaty v. Republic of Iraq, 480 F. Supp. 2d 60
(D.D.C. 2007), "holds that the families of those affected by terrorism are direct victims entitled
to assert independent claims" for IIED. Pls.' Supp. Authority at 1. However, Beaty's discussion
of the victims of terrorism related to the "presence" requirement in IIED claims brought under
the terrorism exception to the FSIA, and had nothing to do with the preemption issue raised by
DOHSA. 480 F. Supp. 2d at 93-94. Applying DOHSA's damages provisions along with the
cause of action provided in DOHSA is perfectly consistent with the FSIA and the terrorism
exception.

The Court sympathizes greatly with Plaintiffs, who continue to suffer terribly years after
their loved ones died. But the Court is bound to follow the legal precedent before it. Congress

42

makes the laws; courts merely interpret them. Whether to amend DOHSA to allow more liberal recovery in cases of death caused by terrorism on the high seas, as Congress did in 2000 for cases of commercial aviation accidents on the high seas, is a question for Congress alone.[19] Accordingly, Plaintiffs' IIED and maritime wrongful death claims are **DISMISSED** for failure to state a claim upon which relief can be granted.

### 4.    Statute of Limitations

The Court need not spend long on Sudan's argument that Plaintiffs' Complaint was not filed within DOHSA's three-year statute of limitations. See 46 U.S.C. app. § 763a. While the FSIA is silent with respect to the appropriate statute of limitations to be applied in cases brought under exceptions other than § 1605(a)(7), it singles out the terrorism exception as meriting a ten-year limitations period. 28 U.S.C. § 1605(f) provides:

> No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

28 U.S.C. § 1605(f). The D.C. district court has interpreted § 1605(f) as having a preemptive effect on other statute of limitations periods. See Owens v. Republic of Sudan, 412 F. Supp. 2d 99, 117 (D.D.C. 2006) (holding that state statute of limitations periods are "irrelevant" to lawsuits brought under terrorism exception); Wyatt v. Syrian Arab Republic, 398 F. Supp. 2d 131, 143 (D.D.C. 2005). Indeed, a necessary corollary of Congress' power to decide the circumstances under which foreign states may be sued is the authority to determine *when* causes

---

[19]Congress amended DOHSA to allow "additional compensation for nonpecuniary damages" in commercial aviation accidents on the high seas beyond twelve nautical miles from the shore of any State. Pub. L. 106-181, § 404(a)-(b), 114 Stat. 61 (2000) (codified at 46 U.S.C. app. §§ 761(b) & 762 (b)(1) and repealed and recodified at 46 U.S.C. § 30307).

of action may be commenced against foreign states. See id. ("[W]hile Congress may choose to waive a foreign state's immunity and allow causes of action to be brought against it 'in the same manner and to the same extent as a private individual under like circumstances,' 28 U.S.C. § 1606, it is not therefore stripped of its authority to require its own statute of limitations to apply in cases against foreign states as a *condition* of that waiver."). Contrary to Sudan's argument that applying the ten-year period instead of a shorter one would "enlarge a substantive cause of action contrary to the intent of Congress," Def. Mot. Dismiss 17, the ten-year period is exactly what Congress intended to apply in cases under § 1605(a)(7). Accordingly, the Court concludes that the ten-year statute of limitations under § 1605(f) applies, and that Plaintiffs' Complaint, which was filed on July 16, 2004, was timely filed.

## III.   DAMAGES

"No section of the FSIA directly addresses the quantum of proof for damages." Hill v. Republic of Iraq, 328 F.3d 680, 683 (D.C. Cir. 2003). However, consistent with 28 U.S.C. § 1606, an "FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." Id. at 683-84 (citing § 1606).

DOHSA provides that recovery in a suit brought under the Act "shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. app. § 762. Pecuniary losses may include loss of support, loss of the services of the deceased, loss of nurture, guidance, care and instruction, loss of inheritance, and funeral expenses if paid by the dependents. Boykin, 835 F. Supp. at 285 (citing Thomas J. Schoenbaum, Admiralty and Maritime Law, § 7-2 (1987)).

The Court, relying upon the seventeen decedents' income taxes and other evidence, has

44

calculate lost earnings that would have been available for contribution had the decedent lived, the Court multiplied each decedent's earnings at the time of death by the number of years that the decedent likely would have worked, assuming various annual rates of wage growth that depend on the decedent's education level and including non-taxable allowances paid by the Navy. The Court took into account the following factors: the amount of time each sailor would have likely stayed in the Navy; the retirement age and age of death; the savings rate; the amount the decedent would have used for his or her own consumption; the taxes he or she would have paid; and the decedent's estate from which children had a reasonable expectation of benefitting. See, e.g., Solomon v. Warren, 540 F.2d 777, 786-95 (5th Cir. 1976); Cox v. Nw. Airlines, Inc., 379 F.2d 893, 896 (7th Cir. 1967); Boykin, 835 F. Supp. at 286; In re the Adventure Bound Sports, Inc., 858 F. Supp. 1192, 1197-1211 (S.D. Ga. 1994). As is required, the future lost earnings were reduced to their "present value" through the use of a discount rate. See Brown v. United States, 615 F. Supp. 391, 395 (D. Mass. 1985). The lost earnings were apportioned among the decedents' eligible surviving family members, with minor children receiving benefits until the age of majority. See 42 U.S.C. app. § 762 (recovery shall be apportioned among persons for whose benefit suit is brought in proportion to loss they may severally have suffered by reason of decedent's death). For those decedents who left children, the Court will award the pecuniary value of the loss of nurture, care, and guidance to each child until he or she reaches the age of twenty-one. See Boykin, 835 F. Supp. at 286. Although it gives the Court no pleasure to do so, it refuses Plaintiffs' request for damages for loss of consortium, loss of solatium, loss of society, mental anguish and emotional distress, because, as emphasized earlier, each of these is non-pecuniary in nature and consequently cannot be recovered under DOHSA. See 46 U.S.C.

46

app. § 762; Boykin, 835 F. Supp. at 285.

The Court **FINDS** that Sudan is liable for the following damages for the pecuniary losses suffered by the following individuals:

**Family of Kenneth Eugene Clodfelter**

1. Jennifer Clodfelter (spouse): $296,631

2. Jennifer Clodfelter as next friend of Noah Clodfelter (son): $201,831

3. John Clodfelter (father): $0

4. Gloria Clodfelter (mother): $0

**Family of Richard Costelow**

1. Sharla Costelow (wife): $549,658

2. Sharla Costelow as next friend of Ethan Costelow (son): $235,309

3. Sharla Costelow as next friend of Brady Costelow (son): $213,369

4. George Costelow (father): $0

5. Dorothy Costelow (mother): $0

**Family of Lakeina Monique Francis**

1. Ronald Wallace Francis (father): $104,648

2. Sandra Annette Francis (mother): $104,648

**Family of Timothy Lee Gauna**

1. Sarah Gauna-Esquivel (mother): $269,898

**Family of Cherone Louis Gunn**

1. Louge Gunn (father): $136,310

2. Mona Gunn (mother): $136,310

5.    Matthew Parlett (brother): $0

**Family of Patrick Howard Roy**

1.    Kate Brown (mother): $234,835

2.    Sean Walsh (brother): $0

3.    Kevin Michael Roy (brother): $0

**Family of Kevin Shawn Rux**

1.    Olivia Rux (wife): $471,327

**Family of Ronchester Mananga Santiago**

1.    Rogelio Santiago (father): $157,708

2.    Simeona Santiago (mother): $157,708

**Family of Timothy Lamont Saunders**

1.    Jacqueline Saunders (wife): $368,126

2.    Jacqueline Saunders as next friend of Isley Gayle Saunders (daughter): $147,666

3.    Jacqueline Saunders as next friend of Jocelyn Tiera Saunders (daughter): $177,380

**Family of Gary Graham Swenchonis**

1.    Gary G. Swenchonis (father): $141,175

2.    Deborah Swenchonis (mother): $142,375

3.    Shalalah Swenchonis-Wood (sister): $0

**Family of Andrew Triplett**

1.    Lorrie D. Triplett (wife): $781,465

2.    Lorrie D. Triplett as next friend of Andrea Triplett (daughter): $220,561

3.    Lorrie D. Triplett as next friend of Savannah R. Triplett (daughter): $271,668

4.    Reed Triplett (father): $0

5.    Savannah Triplett (mother): $0

6.    Kevin Triplett (brother): $0

7.    Wayne Triplett (brother): $0

8.    Freddie Triplett (brother): $0

9.    Theodis Triplett (brother): $0

**Family of Craig Brian Wibberly**

1.    Thomas Wibberly (father): $153,489

2.    Patricia Wibberly (mother): $153,489

3.    Toni Wibberly (sister): $0

## IV.    CONCLUSION

Plaintiffs have established satisfactory evidence, pursuant to 28 U.S.C. § 1608(e), that Sudan is liable for its provision of material support and resources to Al Qaeda that enabled the terrorist group to bring about the extrajudicial killing of seventeen honorable American servicemen and women on October 12, 2000.

We have heard testimony from, and about, those family members who have suffered from the loss of these young men and women. The psychological effects on the survivors can never be erased, especially given that they were caused by a senseless act deliberately enabled by a rogue government. It is depressing to realize that a country organized on a religious basis with religious rule of law could and would execute its power for purposes which most countries would find intolerable and loathsome. It is a further tragedy that the laws of the United States, in

50

this instance, provide no remedy for the psychological and emotional losses suffered by the survivors.

For the reasons set forth herein, it is hereby **ORDERED** that judgment be entered in favor of Plaintiffs and against Defendant Republic of Sudan in the amounts set forth above. The judgments against Defendant total $7,956,344. Defendant shall pay post-judgment interest at the applicable post-judgment federal rate from today's date until paid in full.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record via United States mail. The Clerk shall cause a copy of this Order and Opinion and accompanying judgment to be translated into Arabic and transmitted to the United States Department of State for diplomatic service upon Defendant Republic of Sudan in accordance with the provisions of 28 U.S.C. § 1608(a)(4), with the costs of translation to be paid by Plaintiffs. See 28 U.S.C. § 1608(e).

**IT IS SO ORDERED.**

_____/s/_____
UNITED STATES DISTRICT JUDGE

July 25, 2007
Norfolk, Virginia

51

## SEC. 1083. TERRORISM EXCEPTION TO IMMUNITY.

(a) Terrorism Exception to Immunity-

    (1) IN GENERAL- Chapter 97 of title 28, United States Code, is amended by inserting after section 1605 the following:

### `Sec. 1605A. Terrorism exception to the jurisdictional immunity of a foreign state

`(a) In General-

    `(1) NO IMMUNITY- A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

    `(2) CLAIM HEARD- The court shall hear a claim under this section if--

        `(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

        `(II) in the case of an action that is refiled under this section by reason of section 1083(c)(2)(A) of the National Defense Authorization Act for Fiscal Year 2008 or is filed under this section by reason of section 1083(c)(3) of that Act, the foreign state was designated as a state sponsor of terrorism when the original action or the related action under section 1605(a)(7) (as in effect before the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) was filed;

        `(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred--

            `(I) a national of the United States;

            `(II) a member of the armed forces; or

            `(III) otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment; and

        `(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration; or



`(B) the act described in paragraph (1) is related to Case Number 1:00CV03110 (EGS) in the United States District Court for the District of Columbia.

`(b) Limitations- An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208) not later than the latter of--

`(1) 10 years after April 24, 1996; or

`(2) 10 years after the date on which the cause of action arose.

`(c) Private Right of Action- A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--

`(1) a national of the United States,

`(2) a member of the armed forces,

`(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

`(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

`(d) Additional Damages- After an action has been brought under subsection (c), actions may also be brought for reasonably foreseeable property loss, whether insured or uninsured, third party liability, and loss claims under life and property insurance policies, by reason of the same acts on which the action under subsection (c) is based.

`(e) Special Masters-

`(1) IN GENERAL- The courts of the United States may appoint special masters to hear damage claims brought under this section.

`(2) TRANSFER OF FUNDS- The Attorney General shall transfer, from funds available for the program under section 1404C of the Victims of Crime Act of 1984 (42 U.S.C. 10603c), to the Administrator of the United States district court in which any case is pending which has been brought or maintained under this section such funds as may be required to cover the costs of special masters appointed under paragraph (1). Any amount paid in compensation to any such special master shall constitute an item of court costs.

`(f) Appeal- In an action brought under this section, appeals from orders not conclusively ending the litigation may only be taken pursuant to section 1292(b) of this title.

`(g) Property Disposition-

`(1) IN GENERAL- In every action filed in a United States district court in which jurisdiction is alleged under this section, the filing of a notice of pending action pursuant to this section, to which is attached a copy of the complaint filed in the

action, shall have the effect of establishing a lien of lis pendens upon any real property or tangible personal property that is--

      `(A) subject to attachment in aid of execution, or execution, under section 1610;

      `(B) located within that judicial district; and

      `(C) titled in the name of any defendant, or titled in the name of any entity controlled by any defendant if such notice contains a statement listing such controlled entity.

   `(2) NOTICE- A notice of pending action pursuant to this section shall be filed by the clerk of the district court in the same manner as any pending action and shall be indexed by listing as defendants all named defendants and all entities listed as controlled by any defendant.

   `(3) ENFORCEABILITY- Liens established by reason of this subsection shall be enforceable as provided in chapter 111 of this title.

`(h) Definitions- For purposes of this section--

   `(1) the term `aircraft sabotage' has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation;

   `(2) the term `hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages;

   `(3) the term `material support or resources' has the meaning given that term in section 2339A of title 18;

   `(4) the term `armed forces' has the meaning given that term in section 101 of title 10;

   `(5) the term `national of the United States' has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

   `(6) the term `state sponsor of terrorism' means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

   `(7) the terms `torture' and `extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note).'.

(2) AMENDMENT TO CHAPTER ANALYSIS- The table of sections at the beginning of chapter 97 of title 28, United States Code, is amended by inserting after the item relating to section 1605 the following:

`1605A. Terrorism exception to the jurisdictional immunity of a foreign state.'.

(b) Conforming Amendments-

   (1) GENERAL EXCEPTION- Section 1605 of title 28, United States Code, is amended--

      (A) in subsection (a)--

         (i) in paragraph (5)(B), by inserting `or' after the semicolon;

         (ii) in paragraph (6)(D), by striking `; or' and inserting a period; and

(iii) by striking paragraph (7);

(B) by repealing subsections (e) and (f); and

(C) in subsection (g)(1)(A), by striking `but for subsection (a)(7)' and inserting `but for section 1605A'.

(2) COUNTERCLAIMS- Section 1607(a) of title 28, United States Code, is amended by inserting `or 1605A' after `1605'.

(3) PROPERTY- Section 1610 of title 28, United States Code, is amended--

(A) in subsection (a)(7), by striking `1605(a)(7)' and inserting `1605A';

(B) in subsection (b)(2), by striking `(5), or (7), or 1605(b)' and inserting `or (5), 1605(b), or 1605A';

(C) in subsection (f), in paragraphs (1)(A) and (2)(A), by inserting `(as in effect before the enactment of section 1605A) or section 1605A' after `1605(a)(7)'; and

(D) by adding at the end the following:

`(g) Property in Certain Actions-

`(1) IN GENERAL- Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

`(A) the level of economic control over the property by the government of the foreign state;

`(B) whether the profits of the property go to that government;

`(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

`(D) whether that government is the sole beneficiary in interest of the property; or

`(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

`(2) UNITED STATES SOVEREIGN IMMUNITY INAPPLICABLE- Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

`(3) THIRD-PARTY JOINT PROPERTY HOLDERS- Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.'.

(4) VICTIMS OF CRIME ACT- Section 1404C(a)(3) of the Victims of Crime Act of 1984 (42 U.S.C. 10603c(a)(3)) is amended by striking `December 21, 1988

with respect to which an investigation or' and inserting `October 23, 1983, with respect to which an investigation or civil or criminal'.

(c) Application to Pending Cases-

(1) IN GENERAL- The amendments made by this section shall apply to any claim arising under section 1605A of title 28, United States Code.

(2) PRIOR ACTIONS-

(A) IN GENERAL- With respect to any action that--

(i) was brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), before the date of the enactment of this Act,

(ii) relied upon either such provision as creating a cause of action,

(iii) has been adversely affected on the grounds that either or both of these provisions fail to create a cause of action against the state, and

(iv) as of such date of enactment, is before the courts in any form, including on appeal or motion under rule 60(b) of the Federal Rules of Civil Procedure,

that action, and any judgment in the action shall, on motion made by plaintiffs to the United States district court where the action was initially brought, or judgment in the action was initially entered, be given effect as if the action had originally been filed under section 1605A(c) of title 28, United States Code.

(B) DEFENSES WAIVED- The defenses of res judicata, collateral estoppel, and limitation period are waived--

(i) in any action with respect to which a motion is made under subparagraph (A), or

(ii) in any action that was originally brought, before the date of the enactment of this Act, under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), and is refiled under section 1605A(c) of title 28, United States Code,

to the extent such defenses are based on the claim in the action.

(C) TIME LIMITATIONS- A motion may be made or an action may be refiled under subparagraph (A) only--

(i) if the original action was commenced not later than the latter of-
-

(I) 10 years after April 24, 1996; or

(II) 10 years after the cause of action arose; and

(ii) within the 60-day period beginning on the date of the enactment of this Act.

(3) RELATED ACTIONS- If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, or

section 589 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of Public Law 104-208), any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after--

    (A) the date of the entry of judgment in the original action; or

    (B) the date of the enactment of this Act.

(4) PRESERVING THE JURISDICTION OF THE COURTS- Nothing in section 1503 of the Emergency Wartime Supplemental Appropriations Act, 2003 (Public Law 108-11, 117 Stat. 579) has ever authorized, directly or indirectly, the making inapplicable of any provision of chapter 97 of title 28, United States Code, or the removal of the jurisdiction of any court of the United States.

(d) Applicability to Iraq-

(1) APPLICABILITY- The President may waive any provision of this section with respect to Iraq, insofar as that provision may, in the President's determination, affect Iraq or any agency or instrumentality thereof, if the President determines that--

    (A) the waiver is in the national security interest of the United States;

    (B) the waiver will promote the reconstruction of, the consolidation of democracy in, and the relations of the United States with, Iraq; and

    (C) Iraq continues to be a reliable ally of the United States and partner in combating acts of international terrorism.

(2) TEMPORAL SCOPE- The authority under paragraph (1) shall apply--

    (A) with respect to any conduct or event occurring before or on the date of the enactment of this Act;

    (B) with respect to any conduct or event occurring before or on the date of the exercise of that authority; and

    (C) regardless of whether, or the extent to which, the exercise of that authority affects any action filed before, on, or after the date of the exercise of that authority or of the enactment of this Act.

(3) NOTIFICATION TO CONGRESS- A waiver by the President under paragraph (1) shall cease to be effective 30 days after it is made unless the President has notified Congress in writing of the basis for the waiver as determined by the President under paragraph (1).

(4) SENSE OF CONGRESS- It is the sense of the Congress that the President, acting through the Secretary of State, should work with the Government of Iraq on a state-to-state basis to ensure compensation for any meritorious claims based on terrorist acts committed by the Saddam Hussein regime against individuals who were United States nationals or members of the United States Armed Forces at the time of those terrorist acts and whose claims cannot be addressed in courts in the United States due to the exercise of the waiver authority under paragraph (1).

(e) Severability- If any provision of this section or the amendments made by this section, or the application of such provision to any person or circumstance, is held invalid, the remainder of this section and such amendments, and the application of such provision to

other persons not similarly situated or to other circumstances, shall not be affected by such invalidation.